Filed 6/17/21  Hakenjos Hall Prof. Services v. Korte/Schwartz CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HAKENJOS HALL PROFESSIONAL SERVICES, INC. et al., | D075321 |
| Plaintiffs, Cross-defendants and Appellants, | |
| v. | (Super. Ct. No. 37-2013-00077851-CU-BC-CTL consolidated with 37-2014-00019111-CU-BC-CTL) |
| KORTE/SCHWARTZ, INC. et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes and Richard S. Whitney, Judges.  Affirmed as modified.

Klinedinst and Dan Lawton for Defendants, Cross-complainants, and Appellants.

JW Howard/Attorneys and John W. Howard for Plaintiffs, Cross-defendants, and Appellants.

In 2012, Korte/Schwartz, Inc. (KSI) sold Martin Schwartz's bookkeeping and tax preparation business to Hakenjos Hall Professional

Services, Inc. for $2,075,000.[1]  The sale included title to the business's La Mesa office building which was owned and transferred by the Korte Family Living Trust to Hakenjos Hall.  KSI agreed to carry a promissory note in the amount of $259,375, to be paid by Hakenjos Hall in installments beginning in February 2014.  The parties' agreement contained a covenant not to compete and appended a list of clients for whom KSI and Martin agreed not to provide services for 10 years (the Schedule A clients).  Martin remained with the business as an employee to facilitate the transfer of clients to Carl; during that time Martin's son Jacob Schwartz was also employed briefly by Hakenjos Hall.  Over time, Martin became unhappy with the way Carl ran the business and felt his former clients received inadequate service.  He left at the end of May 2014 to open his own business and continued to provide services to many of the Schedule A clients.  Hakenjos Hall subsequently stopped making payments on the promissory note.

Hakenjos Hall sued the Schwartz parties for breach of contract, interference with contractual relations, and injunctive relief.  Schwartz cross-claimed for breach of contract and various other claims.  After years of contentious litigation, the case proceeded to trial.  The trial court determined the legal issues would be tried to a jury first, and the trial court would subsequently decide any remaining equitable issues.

---

[1]     The appellants are Martin Schwartz, Roberta Korte Schwartz, Korte/Schwartz, Inc. (KSI), Korte Family Trust, and Schwartz and Schwartz. The Korte Family Trust is sometimes interchangeably described as the Korte Family Living Trust.  Appellants refer to themselves collectively as "Schwartz" or the "Schwartz parties."  For ease of reference, we adopt the same convention but we refer to the parties individually where necessary. Similarly, we refer to the respondents—Carl Hakenjos, Jr. (Carl) and Hakenjos Hall Professional Services, Inc. (HHPS)—collectively as Hakenjos Hall, and refer to them individually where necessary.

2

By special verdict, the jury determined that neither Hakenjos Hall nor the Schwartz parties did "all, or substantially all, of the significant things that the contract required [them] to do," the Schwartz parties "committed the first material breach of the contract," and the damages to Hakenjos Hall due to this breach were "loss of profits from noncompete and goodwill breach." The jury awarded Hakenjos Hall $1,068,234 in damages for Schwartz's intentional interference with contractual relations. The jury further determined Martin was liable to Hakenjos Hall for $10,000 in punitive damages for engaging in conduct with malice, oppression, or fraud. Finally, the jury determined Hakenjos Hall was liable for converting Schwartz's e-mail address and awarded $1,000 in damages.

The trial court, sitting in equity, subsequently determined that the jury did not decide liability on the promissory note, and Hakenjos Hall failed to pay on the promissory note. The trial court found it would be inequitable to impose interest and penalties incurred after Schwartz's initial breach of the contract, determined the amount due and owing on the promissory note, and offset that amount to reduce the judgment owed to Hakenjos Hall.

After trial, Schwartz moved for entry of judgment notwithstanding the verdict and for a new trial. (Code Civ. Proc., §§ 629, 657.)[2] The trial court granted the motion for judgment notwithstanding the verdict as to Jacob and Roberta only, but vacated the order subsequently entered because it did not comport with this ruling.

Both parties appealed. The Schwartz parties contend (1) the trial court abused its discretion when it allowed Hakenjos Hall to amend its expert witness list to designate a retained expert, (2) the jury's damages award is

---

[2]    Unless otherwise indicated, statutory references are to the Code of Civil Procedure.

not supported by substantial evidence, (3) the jury's factual determination that the Schwartz parties committed the "first material breach" of contract is not supported by substantial evidence and Schwartz was entitled to judgment notwithstanding the verdict, (4) the trial court erred when it enforced the promissory note as an offset to Hakenjos Hall's damages award but failed to enforce the default remedies set forth in the security agreement and deed of trust, and (5) the trial court erred when it vacated the "Jake and Roberta" judgment.[3]  Hakenjos Hall contends the jury's verdict—purportedly finding Hakenjos Hall did not breach the promissory note—was conclusive on the issue and the trial court erred when it enforced the note.[4]

We conclude the judgment should be modified to strike reference to the Korte Family Trust as a party and to clarify that judgment notwithstanding the verdict was granted as to Jacob Schwartz and Roberta Korte Schwartz (in her individual capacity).  We affirm the judgment as modified.

---

[3]  Jacob and Roberta (in her individual capacity), filed a "protective cross appeal" in the event that Hakenjos Hall contested the trial court's judgment notwithstanding the verdict as to them, which Hakenjos Hall has not done. The issues raised by Jacob and Roberta are therefore moot, and we decline to address them.

[4]  Hakenjos Hall filed a reply brief on cross-appeal.  Nearly all of the reply brief improperly addresses points raised by Schwartz in appellants' reply brief regarding Schwartz's grounds for appeal, rather than addressing Hakenjos Hall's ground for cross-appeal.  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268 [a cross-appellant " 'may not use its *cross-appellant's* reply brief to answer points raised in the *appellant's* reply brief' "].)  We disregard the portions of Hakenjos Hall's reply brief which improperly answer points raised in Schwartz's reply brief, and we deny Schwartz's motion to strike the reply brief as moot.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Sale of Martin's Bookkeeping and Tax Preparation Business*

Martin and his wife, Roberta, co-owned a corporation called Korte/Schwartz, Inc. (KSI). KSI, in turn, owned two businesses: Martin's bookkeeping and tax preparation business (which did business as Martin Schwartz & Associates) and Roberta's specialty food store. Martin Schwartz & Associates operated out of an office building in La Mesa owned by the Korte Family Living Trust. Both Martin and Roberta were trustees of the trust.

In 2012, KSI sold Martin's business, including its goodwill, the office building in La Mesa, equipment, supplies, and an extensive client list, to Hakenjos Hall. The transaction was embodied in several agreements: an "Offer and Purchase Agreement" (purchase agreement), which included in its terms a covenant not to compete, a separate, additional noncompete agreement, a promissory note signed by Carl in favor of Schwartz, a security agreement which provided remedies in the event Hakenjos Hall defaulted on payments under the note, and a deed of trust against the office building securing performance under the note.

According to the purchase agreement, the seller of the business was "[KSI] d/b/a Martin Schwartz & Associates" and the seller of the building was the Korte Family Living Trust. Martin executed the purchase agreement on behalf of both entities, KSI and the trust.[5] The buyer was HHPS. The purchase price was $2,075,000, broken down as follows: $1,145,000 for business goodwill; $875,000 for the office building; $40,000 for the covenant not to compete; and $15,000 for furniture and fixtures. The purchase

---

[5]     Roberta did not sign the purchase agreement, and testified that she had not seen it previously.

agreement contained a provision pursuant to which Hakenjos Hall "represent[ed] and warrant[ed]" it would "operate the [b]usiness in a professional manner."

KSI agreed to carry the promissory note in the amount of $259,375 "to be paid by the buyer." The promissory note was secured by a security agreement and a deed of trust on the office building.

Pursuant to the covenant not to compete in the purchase agreement, "the [s]eller" (KSI) agreed to "not engage in the practice of public accounting . . . for a period of ten (10) years from close," for certain clients, individuals, and business entities listed on a schedule appended to the agreement (the Schedule A clients).[6] In the separate noncompete agreement, Martin agreed that, for 10 years following the transaction's close, he would not "directly or indirectly, either individually or through any corporation, partnership, limited liability company, trust, association, joint venture or other unincorporated business, perform any accounting services for any person or entity, nor will he market or solicit to new clients, within a 25 mile radius of [the La Mesa office building]." In addition, Martin agreed to not perform services for any person or entity who was a client of the company at the time of closing, who had been a client within two years prior to the closing, or who was an "active prospect" of the company at the time of closing.

B. *Complaint, Cross-complaint, and Preliminary Injunction*

In June 2014, Hakenjos Hall filed a complaint against the Schwartz parties. The complaint sought damages and equitable relief and asserted multiple causes of action, including claims for breach of contract, breach of

---

[6] The Schedule A client list was admitted as an exhibit at trial but does not appear in the record. According to counsel's description, the list was about 87 pages long and according to Martin it included approximately 3,000 clients.

6

the noncompete agreement, specific performance, breach of fiduciary duties, and unfair competition.

The Schwartz parties cross-complained, asserting claims for breach of contract, conversion, trespass to chattels, declaratory relief, and additional claims not relevant here.

In November 2014, Hakenjos Hall obtained a temporary restraining order and, later, a preliminary injunction prohibiting the Schwartz parties from soliciting or servicing Schedule A clients. Schwartz appealed from the preliminary injunction order and this court affirmed that order in 2016, observing that, "[u]ltimately, the trier of fact will have to decide if any failure by Hakenjos Hall to render professional services to its own clients is a material breach of the parties' agreement. For purposes of ruling on the motion for preliminary injunction, given the undisputed fact that Hakenjos Hall already paid Schwartz nearly $2 million cash for the Exhibit A clients, the trial court acted well within its discretion in determining that on balance, Hakenjos Hall is likely to prevail on the merits."[7]

C. *Jury Trial*

1. *Evidence*

The evidence established that Hakenjos Hall paid Schwartz $1,815,625 toward the purchase of the business and commercial building and financed the remaining portion of the purchase price with a promissory note payable to KSI in the amount of $259,375. The promissory note was secured by a security agreement and deed of trust on the La Mesa office building. The transaction closed around January of 2012.

---

[7] We take judicial notice of the prior appeal, *Hakenjos Hall Professional Services, Inc., et al. v. Korte/Schwartz, Inc., et al.* (Mar. 2, 2016, D067385) [nonpub. opn.]. (Evid. Code, §§ 452, 459.)

7

Martin stayed on with the business to ease the transition from seller to buyer. The business name was changed from Martin Schwartz & Associates to Schwartz Hakenjos & Associates. Martin stayed with the new business for almost two and a half years during which time Hakenjos Hall paid him about $525,000. During this transition period, Martin continued to perform work for Schedule A clients. Disagreements arose over how the business was managed. Martin felt Carl hired "unprofessional people" to replace individuals in the payroll department. He observed problems involving payroll processing and errors on tax returns that he believed went uncorrected. Clients, including Schedule A clients, complained of significant problems with payroll processing and tax obligations due to Carl's mismanagement, and many suffered tax consequences or incurred penalties as a result.

Carl testified that, in December of 2013, after two bookkeepers left the business, Hakenjos Hall hired a new bookkeeper from an accounting staffing agency. Although the new bookkeeper appeared to be qualified, he made a number of mistakes in client filings. When those mistakes were discovered two months later, Hakenjos Hall replaced him with a "more qualified" and "very skilled" candidate. Over the following months, Carl and his employees worked to rectify the mistakes, and by the first quarter of 2015, the problems were resolved. If Hakenjos Hall was unable to abate any penalty imposed on its clients as a result of these errors, Carl paid the penalty himself.

Between March and May of 2014, when Carl was working to rectify the bookkeeping issues, Hakenjos Hall hired Martin's son, Jacob, to work in the payroll department. Jacob was trained and supervised by Carl's wife. According to Carl, Jacob caused some errors, including missing payments or taking payments from the wrong accounts. According to Jacob, his training

8

was inadequate, he experienced an "incredibly hostile work environment," and he observed that clients were very dissatisfied with the service they were receiving.[8]

During April and May of 2014, Carl and Martin discussed the possibility of Martin opening a satellite office in Mission Valley. During their discussions about opening a new office together, Martin never expressed concern that Carl was providing services in an unprofessional manner. Around the same time, in approximately late May, Martin and Jacob had discussions regarding the covenant not to compete restrictions. They then met with an attorney to discuss the covenant not to compete and the restriction on operating a competing business within a 25-mile radius; Martin testified that they discussed their "options and what [they] were going to do," and Jacob testified that he "had a different view of things" thereafter.

On May 30, 2014, Martin left the business. At trial, Martin claimed he was frustrated that Carl had failed to run the business in a professional manner. Although Martin acknowledged that it was important for Hakenjos Hall to be able to retain the Schedule A clients, he testified that when he left he believed Carl had "broke[n] the contract first" and, as a result of this perceived breach, the covenants not to compete were no longer enforceable. He notified his former clients, including some Schedule A clients, with a postcard and an e-mail that he was opening an office in Encinitas. Many clients left Hakenjos Hall's business and followed Martin to his new competing business.

---

[8] Prior to his employment with Hakenjos Hall, Jacob had no experience performing payroll services. At the time of trial, Jacob had approximately three years of experience. Jacob testified that, in his opinion, the payroll department under Carl's supervision did not meet the business and ethics standards set forth by the IRS for professionals who prepare tax returns.

At trial, Carl estimated that only 20 percent of the Schedule A clients who were tax clientele remained with him after Martin left to open his own business. He estimated that 60 percent of the bookkeeping and payroll clients remained.

In or around 2015, Martin opened an office in Mission Valley, less than 25 miles from the La Mesa office building. He and Jacob, working together, did business as Schwartz & Schwartz. By 2016, a significant portion of Martin's business was dedicated to Schedule A clients. At trial he estimated around 60 to 65 percent of his tax business and roughly 50 percent of his payroll and bookkeeping business was comprised of Schedule A clients. In 2017, the Mission Valley office became Martin's sole business location.

To investigate the circumstances of Martin's departure, Carl and his wife remotely accessed Martin's personal e-mail account and apparently caused his personal e-mail account to be erased in its entirety.[9]

Hakenjos Hall's expert accountant Robert Lauer opined that Hakenjos Hall suffered damages totaling $1,643,418 for the period of 2014 to 2022,

---

[9] There was conflicting testimony regarding who owned the e-mail account following the sale of the business. Carl's wife testified that she logged into the account from her father's residence while someone else (she assumed it was Jacob) was also accessing the account. She attempted to copy some folders and initially stated she thought she deleted files in the process. She later explained that, after gaining a better understanding of the steps she had taken to copy files, she no longer believed she was responsible for deleting documents and, if any deletion occurred, it was accidental. An independent expert testified that he was hired to conduct a forensic examination of computers and phones in the custody of Carl's wife's father, to determine whether Martin's e-mail account had been accessed and whether his e-mails were recoverable. The expert testified that he found evidence of access or use of the e-mail account in 2014 on two of those devices, as well as evidence that a software had been used to "permanently delet[e] evidence in files with no trace."

comprised of damages of $1,118,013 due to Martin's breach of the covenant not to compete for tax services, plus $459,562 for the bookkeeping and payroll services, plus various additional "service damages."[10] He formulated this estimate using spreadsheets provided by Carl which contained data of Martin's post-departure revenues. He applied an assumed profit margin of roughly 45 percent, which was derived from Martin's estimated profit margins during periods prior to 2012—figures which Martin provided to Carl during negotiations for the sale of his business. And he concluded the "book of business" that had been available to the accounting business when Carl purchased it was sufficient to generate this level of revenue.[11]

Schwartz's expert forensic accountant Brian Bergmark criticized Lauer's damages analysis on two bases: (1) Lauer relied unquestioningly on the data contained in spreadsheets prepared by Carl without independently assessing the quality of the data, and (2) Lauer applied a profit margin that was inflated because it was improperly based on margins obtained by Martin in years prior to the business's sale, rather than margins actually obtained by

---

[10]   Hakenjos Hall's expert testified that he made an error in his damages calculation, and his estimate should have reflected an additional $30,000.

[11]   Lauer's expert report was admitted at trial. The Schwartz parties contend they objected, but the record does not support this claim. In their reply brief, the Schwartz parties assert the court admitted the exhibit over their objection but they fail to cite the record. Instead, they cross-reference their opening brief. In their opening brief, the Schwartz parties refer to a joint exhibit list objecting to Lauer's report but they fail to cite to any place in the record where the court reviewed the joint exhibit list. The Schwartz parties contend in their opening brief that the court overruled their objection, but again fail to cite the record. Our review of the record reveals the following exchange occurred at trial: "[Hakenjos Hall's counsel]: I don't believe there's any objection, I'd like to offer into evidence Exhibit 456 [Lauer's report]. [The court]: Objection to 456? [Schwartz's counsel]: *None, your Honor*." (Italics added.)

Carl or those an accounting firm like Hakenjos Hall should have anticipated. Schwartz's expert applied a profit margin of 25 percent to Lauer's data, which he opined was the national average for a firm about the size of Hakenjos Hall. This reduced the damages assessment from Lauer's $1.6 million to $937,000, but Schwartz's expert continued to criticize even that lower estimate based on what he perceived to be faulty assumptions in the data. Schwartz's expert also testified that the outstanding balance on the promissory note was $370,367 (through the end of December 2017).

In closing arguments, Hakenjos Hall argued that Schwartz's provision of services to Schedule A clients was a material breach of their agreement, and Martin raised no claims of unprofessional behavior until lawyers got involved in the parties' dispute. Schwartz argued that Carl behaved unprofessionally towards the clients, which constituted a material breach of the agreement and prompted Martin's departure.

### 2. *Jury Instructions*

The jury was instructed with CACI No. 303 as to the elements of a breach of contract as follows:

"To recover damages for breach of contract, each party claiming that the other one breached a contract must prove all of the following: [¶] (1) [t]hat the parties entered into a contract; [¶] (2) [t]hat the party claiming the other one breached a contract did all, or substantially all, of the significant things that the contract required it to do; [¶] (3) [t]hat all conditions required by the contract for performance by the party against whom a breach has been claimed had occurred; [¶] (4) [t]hat one or both of the parties failed to do something that the contract required it to do; and [¶] (5) [t]hat the party claiming the other one breached the contract was harmed by that failure."

The jury was further instructed regarding "[f]irst [m]aterial [b]reach" as follows: "You have been instructed that the failure to perform a contractual obligation may result in either a partial or material breach of the contract. In this case, both Hakenjos Hall and Korte/Schwartz contend the other side committed material breaches of the contract. Under such circumstances, you must impose liability on the party that committed the first material breach of the contract. You are reminded that a partial, nonmaterial breach of the contract by one party does not justify termination of the contract by the other party. Similarly, a material breach of the contract which has been waived or cured does not justify termination of the contract by the injured party. A party injured by a partial, nonmaterial breach of contract must continue to perform its obligations under the contract and will be entitled to damages to compensate it for injury resulting from the partial breach." (Underlining omitted.)

The jury was instructed that "a 'material' breach of contract is a breach (a failure to perform the contract) that strikes so deeply at the heart of the contract that it renders the agreement 'irreparably broken' and defeats the purpose of making the contract in the first place. The breach must go to the very root of the agreement between the parties. If there is a material breach (sometimes referred to as a 'total' breach), the other party can simply end the agreement and go to court to try to collect damages caused by the breach."

The jury was instructed that, to determine whether a breach was " 'material,' " it must consider: "(a) [t]he extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated; [¶] (b) [t]he extent to which the injured party may be adequately compensated in damages for lack of complete performance; [¶] (c) [t]he extent to which the party failing to perform has already partly

13

performed or made preparations for performance; [¶] (d) [t]he greater or [lesser] hardship on the party failing to perform in terminating the contract; [¶] (e) [t]he willful, negligent or innocent behavior of the party failing to perform; [¶] (f) [t]he greater or [lesser] uncertainty that the party failing to perform will perform the remainder of the contract."

The jury was instructed that the signed documents admitted into evidence which were part of the same transaction "must be interpreted together as one contract." The jury was further instructed, "If there are any provisions in one of these documents limiting, explaining, or otherwise affecting the provisions of another, all such provisions should be given consideration in determining the agreement of the parties."

### 3. *Verdict*

The jury returned a special verdict with the following determinations:[12] (1) with respect to breach of contract, the jury determined the Hakenjos parties and the "Schwartz parties" entered into a contract; neither of the parties did all or substantially all of the significant things that the contract required them to do; the "Schwartz parties" committed the first material breach of the contract; the damages to the Hakenjos parties due to the Schwartz parties' breach were "loss of profits from [noncompete] and

---

[12]    The special verdict form sometimes referred to the "Schwartz parties" or "Schwartz" alone in one question. However, the special verdict form at other times confusingly referenced both the "Schwartz parties" and "Schwartz" in a single question. Where a question refers to both Schwartz and the Schwartz parties, we use the broader category (the Schwartz parties) and quote from the special verdict in listing the jury's determinations. The jury was instructed that it had to "determine the liability of each cross-defendant separately," but the special verdict form did not provide for separate liability findings for each defendant on each cause of action. Both parties jointly prepared and agreed upon the form of the special verdict.

14

goodwill breach";[13] (2) with respect to intentional interference with contractual relations, the jury determined Hakenjos Hall had an economic relationship with its former clients that would have resulted in an economic benefit in the future; the "Schwartz parties" knew of this relationship and engaged in specific conduct intending to disrupt the relationship and actually disrupted the relationship, causing harm to Hakenjos Hall, with damages amounting to $1,068,234; and Schwartz acted with "malice, fraud, or oppression"; (3) with respect to aiding and abetting a tort, the jury responded affirmatively when asked whether "any of the Schwartz parties" knew of wrongdoing committed against Hakenjos Hall or Carl Hakenjos, and gave substantial assistance or encouragement in committing the wrongdoing, causing harm to Hakenjos Hall or Carl Hakenjos. The jury additionally found that Hakenjos Hall wrongfully converted "Mr. Schwartz's" e-mail address and awarded "Mr. Schwartz" $1,000 in damages.[14]

After additional proceedings, the jury determined that only Martin—not Jacob, Roberta, or the Schwartz entities—engaged in conduct with malice, oppression or fraud, and separately awarded punitive damages against Martin in the amount of $10,000.

---

[13] In response to a jury question, "[g]oodwill" was defined as "the benefit that a business gains as a result of its location, reputation for dependability, skill, or quality, and any other circumstances that cause a business to keep old customers or gain new customers."

[14] The jury additionally found that these same actions constituted a trespass to chattels and awarded "Mr. Schwartz" $1,000 on that cause of action; however, recovery on this cause of action was stayed by the trial court to prevent double recovery for the same tortious conduct. The jury made additional determinations that did not result in a damages award to either party and are not relevant to the issues on appeal.

D. *Bench Trial on Equitable Issues*

After the jury trial, the trial court convened a bench trial on four remaining equitable issues: whether the preliminary injunction previously issued by the court should ripen into a permanent injunction; whether Hakenjos Hall elected the remedy of money damages and is now bound by that election in lieu of injunctive relief; whether the court should issue declaratory relief finding the promissory note remains enforceable; and whether the doctrine of unclean hands precludes either party from obtaining the equitable relief sought. No additional evidence was taken, but the parties presented argument. Hakenjos Hall argued that the damages awarded at trial covered past damages only and contended the court should make the preliminary injunction permanent and enter an order enjoining Schwartz from providing tax, accounting, payroll or bookkeeping services to Schedule A clients and clients within a 25-mile radius of the Hakenjos Hall office. Schwartz argued that the trial court should dissolve the preliminary injunction because Hakenjos Hall had received adequate money damages at trial, or, alternatively, the court should make the injunction permanent and also order that Hakenjos Hall forfeited his damages award pursuant to the doctrine of election of remedies. Schwartz also argued that, because it was undisputed that Hakenjos Hall defaulted on the promissory note, the court should order Hakenjos Hall to resume payments on the note, or to appoint a receiver or proceed with foreclosure.

The trial court issued a statement of decision on equitable issues in which it found that the jury's damages award to Hakenjos Hall for breach of contract was an election of remedies that precluded Hakenjos Hall from additionally obtaining a permanent injunction to enforce the contract's noncompete clause or the covenant not to compete.

16

With regard to Schwartz's claim for declaratory relief on the promissory note, the trial court found that, although the parties entered a single contract for the purchase and sale of the business, the contract was divisible, and the jury did not decide liability on the promissory note. The trial court found that Martin's failure to abide by the covenant not to compete did not eliminate Hakenjos Hall's duty to pay for the building. The trial court additionally found that the jury's determination that Martin, individually, acted with malice (justifying an award of punitive damages) was not attributed to KSI, the party to the contract and the beneficiary of the promissory note.

Hakenjos Hall subsequently requested that the court offset the judgment entered in its favor with the amount due on the promissory note. Schwartz argued offset was not appropriate because it was not previously requested in the parties' pleadings. Schwartz requested an order that Hakenjos Hall continue making payments and stated, "[i]f they default in the making of the payments . . . we will be back here and we will be asking for a receivership and other things."

The trial court found that the amount "due and owing" to KSI under the promissory note was $278,149.74 and applied that amount to offset Hakenjos Hall's award of $1,068,234.

E. *Judgment*

The trial court entered judgment in favor of plaintiffs Carl Hakenjos and Hakenjos Hall, Inc. and against Martin Schwartz, Jacob Schwartz, Roberta Korte Schwarz, "individually and as Trustee of the Korte Family Trust," KSI, the "Korte Family Trust," and Schwartz and Schwartz, Inc., and awarded the plaintiffs $1,068,234, "jointly and severally, for breach of contract, specifically, the [p]urchase [a]greement and [noncompete]

[a]greement, and for [i]ntentional [i]nterference with a [c]ontract." The trial court found that the amount due and owing on the promissory note, $278,149.74, should be set off against the judgment of $1,068,234, reducing the judgment in Hakenjos Hall's favor to a total of $790,084.30. The judgment indicated, "This set-off pays the [p]romissory [n]ote in full and no further balance is due thereunder from Hakenjos Hall Professional Services, Inc. to [KSI]."

The court entered judgment in favor of Martin as against Hakenjos Hall, and awarded Martin $1,000 for conversion.

The judgment further indicated that Hakenjos Hall would recover $10,000 in punitive damages against Martin.

F. *Posttrial Motions*

After judgment was entered, Schwartz moved for a new trial or judgment notwithstanding the verdict (§§ 629, 657) arguing that the finding that Hakenjos Hall failed to do all that the contract required it to do was "inconsistent and irreconcilable" with the finding that the Schwartz parties committed the first material breach. The Schwartz parties further argued that there was no evidence to support a judgment against Roberta or Jacob. The Schwartz parties also argued a new trial was warranted because Hakenjos Hall's damages model was "unreliable" and the jury's damages award was fatally speculative.

The parties appeared before a different trial judge for a hearing on the motions.[15]  The trial court denied the new trial motion and denied the motion for judgment notwithstanding the verdict as to Martin.  However, the trial court observed that Hakenjos Hall did not address the lack of evidence to support a verdict against Roberta and Jacob and granted the motion for judgment notwithstanding the verdict as to them only.  The trial court subsequently entered an order granting in part the motion for judgment notwithstanding the verdict.  In doing so, the trial court used a proposed order submitted by the Schwartz parties.  The order provided: "The Court hereby enters judgment in favor of Jacob Schwartz and Roberta Korte Schwartz (individually and in her capacity as trustee of the Korte Family Trust) notwithstanding the verdict delivered by the jury . . . as to all of the causes of action asserted against them . . . .  Those causes of action are hereby dismissed on their merits and with prejudice.  [¶]  Jacob Schwartz and Roberta Korte Schwartz (individually and in her capacity as trustee of the Korte Family Trust) are prevailing parties for purposes of entitlement to costs . . . , and shall have and recover of plaintiffs such costs as the Court shall award to them . . . ." (Some capitalization omitted.)

Hakenjos Hall thereafter moved under section 473, subdivision (b) to vacate the order entered and to enter a new order that correctly reflected the court's ruling.  Hakenjos Hall argued that counsel inadvertently erred when it compiled the drafts in opposition to Schwartz's motions by neglecting to

_____

15    The judge who presided over the jury trial and subsequent bench trial on equitable issues retired prior to the hearing on Schwartz's posttrial motions.  The judge to whom the case was thereafter assigned acknowledged it was "unfortunate[]" the parties did not have the benefit of having the motion heard by the prior judge but indicated he had researched the issues and reviewed the record.

19

incorporate an argument responding to the assertions regarding the propriety of the judgment against Jacob and Roberta. Hakenjos Hall argued that entry of judgment against Roberta as trustee of the Korte Family Living Trust was appropriate because that entity was a party to the purchase and sale agreement (as the prior owner of the La Mesa office building), and, inasmuch as Roberta was a co-trustee of the family trust, she was liable as a party to the purchase agreement. Hakenjos Hall also argued that the order entered by the court, which had been prepared by Schwartz, did not correctly reflect the court's decision. Counsel explained he objected to the proposed order when Schwartz shared a draft, but Schwartz nonetheless submitted the proposed order to the court without changes.

The trial court found that the order entered did not comport with its order granting in part Schwartz's motion for judgment notwithstanding the verdict. The trial court observed that the Korte Family Living Trust was a party to the purchase and sale agreement, and that Roberta, as a trustee of the trust, could be liable in her capacity as trustee. The court exercised its authority pursuant to section 128, subdivision (a), to vacate the order inasmuch as it relieved Roberta from liability in her capacity as trustee, and inasmuch as it identified Jacob and Roberta as "prevailing parties."

Schwartz and Hakenjos Hall timely filed cross-appeals from the judgment and postjudgment orders.

DISCUSSION

I

*The Expert Witness Procedure Was Not Prejudicial*

A. *Additional Background*

Hakenjos Hall filed this action in June 2014. Schwartz filed a cross-complaint in August. An initial trial date was set for July 8, 2016, and in

20

September 2015, the trial date was continued until July 15, 2016. Discovery disputes were recurring and heavily contested.[16] In February 2016, the trial court appointed a discovery referee. The discovery referee issued an initial discovery stipulation in March 2016.

In April, Hakenjos Hall sought to vacate the then-current trial date of July 15, 2016. Over Schwartz's objection, the trial court continued trial until September 9, 2016. The minute order indicated that the trial date was continued, directed motions and discovery to be completed by August 12, and set dates for the parties' first and second expert witness information exchange, for June 10 and June 24, respectively.

On June 10, Schwartz disclosed expert witness information, naming three retained experts and also designating Martin and Jacob as experts. At that time, Hakenjos Hall disclosed only Carl as an expert but stated they "reserve[d] the right to name additional experts once Schwartz et al[.] fully and completely comply with their long outstanding discovery obligations." On June 24, Hakenjos Hall's counsel filed an objection to designating experts, again contending Hakenjos Hall should not be required to name additional

---

[16] We recount the history of the parties' discovery disputes because it is relevant to the trial court's decision regarding the designation of expert witnesses discussed *post*. However, we need not address the merits of Hakenjos Hall's repeated assertions that Schwartz "continuously stonewalled . . . discovery." We note the trial court granted Hakenjos Hall's motion in limine precluding the parties from referring to alleged discovery violations before the jury.

experts until the Schwartz parties "full[y] and complete[ly]" complied with their discovery obligations.[17]

As the parties continued to litigate discovery issues, the discovery referee issued updated discovery status reports in May, June, August, November, and December of 2016, and in January and February of 2017. At Hakenjos Hall's request, the trial dates were repeatedly continued until December 2016, January 2017, and March 2017.[18]

In January 2017, the discovery referee reported that the parties continued to engage in discovery disputes and Hakenjos Hall had not completed Jacob's or Martin's depositions. The discovery referee "reluctantly recommend[ed] a brief trial continuance" but observed that "[a] lack of due diligence by [Hakenjos Hall's counsel] has contributed substantially to these delays." Trial was continued again to March. The order continuing trial indicated that "[a]ll [m]otions and [d]iscovery are to be completed [by February 10, 2017]."

---

[17]    Hakenjos Hall further contended the Schwartz parties' "wrongful conduct in delay and refusal to produce responses/documents to valid discovery [had] prevented Hakenjos [Hall] from being able to name relevant experts, including, preventing any consultant or potential expert to review case appropriate information by which to form opinions." At the same time, the Schwartz parties were seeking compliance from Hakenjos Hall regarding inspections by the independent forensic expert.

[18]    According to the discovery referee's status report dated June 16, Schwartz's counsel had recently "delivered about 10,000 additional pages of discovery to [Hakenjos Hall's counsel] who [was] reviewing them and [found] them incomplete." The discovery referee directed that outstanding discovery be provided by Schwartz's counsel "no later than July 8, 2016." When trial was continued until December, the court directed that motions and discovery were to be completed by November 2016. In November 2016, in the midst of the parties' still-ongoing discovery disputes, the trial court continued trial until January 20, 2017, without continuing other hearing or discovery dates.

The parties continued to litigate discovery issues, including disclosure of the Schwartz parties' tax returns and profit and loss statements. On February 21, the discovery referee issued his seventh discovery recommendation and status report, indicating that the Schwartz parties' counsel sought a recommendation that the trial court conduct a contempt hearing concerning Hakenjos Hall's counsel's violation of the stipulated protective order.[19] The discovery referee recommended that the trial court hold a contempt hearing but declined to recommend what the outcome of such a hearing should be.

Shortly thereafter, around February 27, 2017, Hakenjos Hall's attorney sustained injuries in a fall. After counsel submitted "confidential documents" for the trial court's review, trial was continued to April and later until June "due to [counsel's] current medical condition." Discovery and motion dates remained unchanged. At a hearing in June, the trial court continued trial sua sponte until September.[20]

In July 2017, Hakenjos Hall substituted his attorney out of the case and replaced him with new counsel. New counsel promptly filed an ex parte application for an order continuing trial and "all associated dates, including

---

[19]  It was alleged that Hakenjos Hall's counsel allowed Carl to see documents that were designated as "confidential attorney eyes only," in violation of a stipulated protective order.

[20]  This order does not appear in the record. In June 2017, Schwartz filed a motion to dismiss Hakenjos Hall's action "for undue delay in prosecution" or "for terminating sanctions." Schwartz argued that Hakenjos Hall, through its counsel, had sought and obtained multiple trial continuances while engaging in "pervasive litigation misconduct," and then claimed an unsubstantiated medical disability, while continuing to stonewall the litigation process. Hakenjos Hall opposed the motion. After a hearing, the trial court denied the motion, indicating, "[t]here's a strong preference for trial on the merits."

discovery and motion [cutoff] and the dates for the designation of experts" for four months, from September 2017 until January 2018, arguing that Schwartz had "stonewalled the discovery process," and further arguing that former counsel had "suffered a decline in health and capacity" over a period of time during which he became "increasingly unreliable and uncommunicative and incapable of providing the representation necessary to prepare for trial," prompting a substitution of counsel.

In August 2017, the parties appeared at an ex parte hearing on Hakenjos Hall's application for an order continuing trial and "all associated dates." At the hearing, Hakenjos Hall's new counsel argued that trial continuances had been previously granted "because [the Schwartz parties] didn't produce documents," and substitution of counsel had become necessary because former counsel had not competently represented his client, had failed to designate expert witnesses, and failed to file motions to compel the production of certain documents from the Schwartz parties. Counsel argued that the required substitution of counsel constituted good cause to continue the trial date. Counsel stated, "We do not have any experts at this time in a case that cries out for experts" and argued his clients were entitled to have the case tried on the merits.

Schwartz argued that the trial had already been continued nine times, with continuances repeatedly sought by the plaintiffs, and that it was the plaintiffs who had resisted discovery efforts, to the point that the discovery referee had recommended a contempt hearing be noticed for Hakenjos Hall's prior counsel. Schwartz further argued that new counsel joined the case aware of the current trial and discovery dates yet did not attempt to meet and confer regarding the dates prior to seeking a continuance from the court.

The trial court indicated it needed to balance the potential for prejudice for both parties and stated it was willing to briefly continue the trial date. The trial court further stated it intended to ensure a trial "where there have been experts, where everyone's been deposed, [and] where the matter is ready for trial," and suggested it was willing to "accommodate" Hakenjos Hall because the previous "failure" to designate experts was "arguably [attributed to] counsel who has been incapacitated."

In response, Schwartz argued that allowing Hakenjos Hall to designate a retained expert was "not fair," as prior counsel had served an expert witness designation designating Carl as an expert, and Hakenjos Hall had failed to seek any relief under the expert witness procedures.

The trial court stated it would allow plaintiffs' counsel additional time to designate experts, but, to mitigate prejudice to the Schwartz parties, would require plaintiffs to pay the costs of the expert depositions. The court continued trial until December and directed the parties to exchange expert witness information on October 19, with a second exchange to occur on November 8.[21]

Schwartz filed a petition for writ of mandate in this court seeking review of the trial court's minute order continuing trial and extending the

---

[21] The minute order continued trial until December 8, 2017, and indicated: "First exchange date is continued to 10/19/17. [¶] Second exchange date is continued to 11/8/17. [¶] Motion cut off date remains as set. Counsel are to come in ex parte if they need to set a motion."

time for parties to disclose expert witnesses. We summarily denied the petition on August 17, 2017, in case No. D072617.[22]

In October 2017, the discovery referee reported that circumstances indicated the Schwartz parties may not have previously produced all documents responsive to prior discovery requests. Consistent with one of the discovery referee's recommendations, the trial court entered an order requiring the Schwartz parties "to conduct a diligent review of their records and produce all of the unprivileged documents, not previously produced, with particular emphasis on items that have come into existence since December 2016 and all records reviewed or considered in connection with the preparation of [an exhibit attached to a declaration previously submitted by Martin]."

On October 19, 2017, Hakenjos Hall designated their retained expert witness Robert Lauer, who opined at trial as to lost profit damages.

In November, Martin sat for a one-hour deposition regarding issues related to document production and repeatedly attested that the plaintiffs " 'have everything,' " but in early December, Schwartz supplemented their document production with an additional 55 pages of documents.[23]

---

[22]    "[A] summary denial of a petition for a writ of mandate is not a merits adjudication and 'does not establish law of the case . . . .' " (*Golden Door Properties, LLC v. Superior Court* (2020) 52 Cal.App.5th 837, 891, quoting *Kowis v. Howard* (1992) 3 Cal.4th 888, 899.) Accordingly, we reject Hakenjos Hall's contention that we should not entertain Schwartz's arguments on appeal because this court "has already reviewed" this issue.

[23]    The trial court subsequently ordered that, absent a showing of good cause, these documents would be excluded from use at trial unless offered by plaintiffs or their experts. In late November 2017, Hakenjos Hall sought another brief continuance of trial due to a medical emergency experienced by Lauer. The trial court reset trial for January 2018.

26

Prior to trial, Schwartz had the opportunity to take Lauer's deposition.[24] Schwartz's expert had the opportunity to review the transcript of Lauer's deposition and Lauer's expert report prior to trial, and at trial Schwartz had the opportunity to cross-examine Lauer and to elicit testimony from their own expert that was critical of Lauer's position.

B. *Applicable Law*

1. *General Discovery Procedures*

"[T]he dates assigned for a trial are firm." (Cal. Rules of Court, rule 3.1332(a).) However, a trial court may continue a trial date on a party's noticed motion or ex parte application. (*Id.*, rule 3.1332(b).) "Although continuances of trials are disfavored, each request for a continuance must be considered on its own merits. The court may grant a continuance only on an affirmative showing of good cause requiring the continuance." (*Id.*, rule 3.1332(c).) "[T]he court must consider all the facts and circumstances that are relevant to the determination." (*Id.*, rule 3.1332(d).) "Where denial of a continuance would result in manifest injustice" it is an abuse of discretion to deny it. (*Hamilton v. Orange County Sheriff's Dept.* (2017) 8 Cal.App.5th 759, 766.)

Parties are entitled "as a matter of right to complete discovery proceedings on or before the 30th day, and to have motions concerning discovery heard on or before the 15th day, before the date initially set for the trial of the action." (§ 2024.020, subd. (a); *Pelton-Shepherd Industries, Inc. v.*

_____

[24]  Schwartz contends they "managed to take [Lauer's] deposition," but suggests that, because the deposition occurred nearly four weeks before the trial started, "the schedule could hardly be said to satisfy the orderly and fair protocol provided by the Discovery Act." For the reasons explained herein, we conclude Schwartz has failed to establish any prejudice. Schwartz also did not seek a continuance or ask the trial court for more time to depose Lauer or prepare for trial following his deposition.

*Delta Packaging Products, Inc.* (2008) 165 Cal.App.4th 1568, 1586 (*Pelton-Shepherd*).) "Except as provided in Section 2024.050, a continuance or postponement of the trial date does not operate to reopen discovery proceedings." (§ 2024.020, subd. (b).) A party seeking to reopen discovery is required to file a noticed motion, accompanied by a meet and confer declaration.[25] (§§ 2024.050, subd. (a), 2016.040.) A noticed motion with an accompanying meet and confer declaration is similarly required to augment an expert witness list (§ 2034.610, subds. (a), (c)) or to submit tardy expert witness information (§ 2034.710, subds. (a), (c)). In exercising its discretion to grant or deny a request to reopen discovery, "the court shall take into consideration any matter relevant to the leave requested, including, but not limited to, the following: [¶] (1) [t]he necessity and the reasons for the discovery[;] [¶] (2) [t]he diligence or lack of diligence of the party seeking the discovery or the hearing of a discovery motion, and the reasons that the discovery was not completed or that the discovery motion was not heard earlier[,] [¶] (3) [a]ny likelihood that permitting the discovery or hearing the discovery motion will prevent the case from going to trial on the date set, or otherwise interfere with the trial calendar, or result in prejudice to any other party[,] [¶] (4) [t]he length of time that has elapsed between any date previously set, and the date presently set, for the trial of the action." (§ 2024.050, subd. (b); *Pelton-Shepherd*, at pp. 1586-1587 [trial court committed prejudicial error in granting party's motion to compel after the discovery motion cutoff date when the party had not moved to reopen discovery under § 2024.050].)

---

[25] "A meet and confer declaration in support of a motion shall state facts showing a reasonable and good faith attempt at an informal resolution of each issue presented by the motion." (§ 2016.040.)

## 2. *Expert Discovery Procedures*

The purpose of the expert witness discovery statutes is "to give fair notice of what an expert will say at trial. This allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area. . . . 'Late disclosure of experts . . . frustrates the very purposes of the discovery statutes, and should be permitted, with appropriate safeguards and limits, only when absolutely necessary to avoid a miscarriage of justice.' " (*Bonds v. Roy* (1999) 20 Cal.4th 140, 146-147 (*Bonds*).)

Section 2034.210, subdivision (b) provides: "After the setting of the initial trial date for the action, any party may obtain discovery by demanding that all parties simultaneously exchange information concerning each other's expert trial witnesses . . . ." "The demand shall specify the date for the exchange of lists of expert trial witnesses, expert witness declarations, and any demanded production of writings. The specified date of exchange shall be 50 days before the initial trial date, or 20 days after service of the demand, whichever is closer to the trial date, unless the court, on motion and a showing of good cause, orders an earlier or later date of exchange."[26]

---

[26] The San Diego Superior Court local rules dispense with the requirement that a party serve an expert witness discovery demand and provide instead that "[t]he court will propose deadlines for the exchange of information concerning expert witnesses and their discoverable reports and writings . . . at the [c]ase [m]anagement [c]onference," but further provide that, "[a]lthough the demand requirement . . . may be dispensed with at this hearing, all other provisions of . . . section 2034.210 et seq. will be strictly enforced by the court." (Super. Ct. San Diego County, Local Rules, rule 2.1.11.)

"All parties who have appeared in the action shall exchange information concerning expert witnesses in writing on or before the date of exchange specified in the demand." (§ 2034.260, subd. (a).) "[O]n objection of any party who has made a complete and timely compliance with [s]ection 2034.260, the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to . . . [¶] [l]ist that witness as an expert under [s]ection 2034.260." (§ 2034.300, subd. (a).)

When a party who has engaged in a timely exchange of expert witness information seeks leave to augment their expert witness list or amend an expert witness's declaration, the trial court may grant such leave "only if all of the following conditions are satisfied: [¶] (a) [t]he court has taken into account the extent to which the opposing party has relied on the list of expert witnesses[;] [¶] (b) [t]he court has determined that any party opposing the motion will not be prejudiced in maintaining that party's action or defense on the merits[; and] [¶] (c) [t]he court has determined either of the following: [¶] (1) [t]he moving party would not in the exercise of reasonable diligence have determined to call that expert witness or have decided to offer the different or additional testimony of that expert witness[; or] [¶] (2) [t]he moving party failed to determine to call that expert witness, or to offer the different or additional testimony of that expert witness as a result of mistake, inadvertence, surprise, or excusable neglect, and the moving party has done both of the following: [¶] (A) [s]ought leave to augment or amend promptly after deciding to call the expert witness or to offer the different or additional testimony[; and] [¶] (B) [p]romptly thereafter served a copy of the proposed expert witness information concerning the expert or the testimony described

30

in Section 2034.260 on all other parties who have appeared in the action."[27] (§ 2034.620, subds. (a)-(c); see also§ 2034.720 [listing similar requirements concerning extension of time for a party who failed to timely submit expert witness information].)

### 3. *Standard of Review*

A motion to continue trial and to extend discovery are both subject to the trial court's discretion. (*Cottini v. Enloe Medical Center* (2014) 226 Cal.App.4th 401, 418-419.) Similarly, a motion to augment or amend an expert witness designation or declaration, and a motion to reopen discovery, are subject to the trial court's discretion. (See *Dickison v. Howen* (1990) 220 Cal.App.3d 1471, 1476 (*Dickison*) ["[t]he decision to grant relief from the failure to designate an expert witness is addressed to the sound discretion of the trial court and will not be disturbed on appeal absent a showing of manifest abuse of that discretion"]; *Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242, 1246 [reviewing trial court's refusal to reopen discovery under the abuse of discretion standard of review].)

A trial court's abuse of discretion amounts to reversible error only if it results in a miscarriage of justice. (Cal. Const., art. VI, § 13.) A judgment is subject to reversal only if, after examining the entire cause, including the evidence, we determine it is reasonably probable that a result more favorable to the Schwartz parties would have been reached in the absence of the error.

---

[27] Subdivision (d) of section 2034.620 further provides that "[l]eave to augment or amend is conditioned on the moving party making the expert available immediately for a deposition under Article 3 (commencing with Section 2034.410), and on any other terms as may be just, including, but not limited to, leave to any party opposing the motion to designate additional expert witnesses or to elicit additional opinions from those previously designated, a continuance of the trial for a reasonable period of time, and the awarding of costs and litigation expenses to any party opposing the motion."

31

(*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800, citing *People v. Watson* (1956) 46 Cal.2d 818, 836; see *Pelton-Shepherd, supra,* 165 Cal.App.4th at p. 1589 [assessing prejudice under *Watson* standard where trial court erroneously heard belated discovery motion without requiring party to also move to reopen discovery under § 2024.050].)

C. *Analysis*

Schwartz contends the trial court committed prejudicial error when it "excus[ed]" Hakenjos Hall from complying with the statutory requirements governing the designation of expert witnesses.[28]  Schwartz acknowledges the trial court tried to mitigate any prejudice to the Schwartz parties, but contends that allowing Hakenjos Hall to amend their expert witness list to designate a retained expert caused unfair harm at trial.  We conclude the trial court did not commit reversible error when it effectively reopened discovery to allow Hakenjos Hall to augment their expert witness list.

The trial court acted within its discretion when it continued the date of trial pursuant to Hakenjos Hall's ex parte application.  (Cal. Rules of Court, rule 3.1332(b).)  However, by simultaneously extending expert discovery dates, the trial court effectively granted leave to reopen discovery and to allow the parties to augment their expert witness lists.  (§§ 2024.050, 2034.610, 2034.620.)  While the trial court had discretion to do so, that discretion was governed by the applicable provisions of the Civil Discovery Act.  (See *Pelton-Shepherd, supra,* 165 Cal.App.4th at p. 1571.)  The trial

---

[28]    Schwartz argues on appeal that the applicable procedures are those set forth in sections 2034.710 through 2034.730, which govern a motion to submit tardy expert witness information made by "any party who has failed to submit expert witness information on the date specified in a demand for that exchange."  (See § 2034.710, subd. (a).)  Here, however, Hakenjos Hall timely designated Carl as an expert witness and subsequently sought relief to designate *additional* expert witnesses.

32

court did not comply with the applicable procedural rules when it reopened discovery and extended the expert witness designation dates on an ex parte basis (rather than on noticed motion), without the required meet-and-confer declaration (see §§ 2024.050, 2034.610). We note that the ex parte application expressly stated Hakenjos Hall wanted to continue trial and designate experts, but the Schwartz parties did not object on the ground that the court should require a noticed motion prior to allowing Hakenjos Hall to designate a retained damages expert.[29] If an objection had been made and the statutory procedures for reopening discovery and augmenting expert witness lists had been followed (§§ 2024.050, 2034.610, 2034.620), we would have a more complete record as to the parties' competing claims of good cause and undue prejudice. (See *Richaud v. Jennings* (1993) 16 Cal.App.4th 81, 92 (*Richaud*) [a motion to augment or amend the expert witness designation "would allow the opponent to explain the prejudice created, allow the proponent to demonstrate good cause for any delay and, most importantly, allow the court to minimize any continuances and disruption of the litigation"].)

Although the trial court should have followed the statutory procedures, under the circumstances here, we do not find the abuse of discretion to be prejudicial because it is not reasonably probable the Schwartz parties would have achieved a more favorable result in the absence of any error. (Cal. Const., art. VI, § 13; *Pelton-Shepherd, supra,* 165 Cal.App.4th at p. 1589.)

---

[29]    Instead, Schwartz contended that trial should not be continued and questioned whether prior counsel's injuries were so significant that substitution of counsel or another continuance of trial was warranted. Only near the end of the ex parte hearing did Schwartz mention that there were other procedures for seeking relief regarding the expert designations. Schwartz never indicated what the applicable procedures were and failed to object that the court was not following those procedures.

Schwartz argues they were prejudiced because Hakenjos Hall was permitted to present testimony from a retained expert (Lauer) opining that Schwartz's breach and interference caused damages exceeding $1.6 million, and it is reasonable to infer the jury relied on Lauer's opinion—even though the jury did not award the full amount Hakenjos Hall requested—because it was the only one proffered as to damages. But "[a] party is not 'prejudiced' simply because the new expert will give testimony adverse to the party." (*Dickison*, *supra*, 220 Cal.App.3d at p. 1479.) Rather, the statutory scheme "evidence[s] a concern with prejudicing the [opposing] party . . . by adding a new expert for which that party, due to its reliance on the previous list of experts, *is not prepared and cannot be prepared in time*." (*Ibid*., italics added.)

Here, Hakenjos Hall's newly substituted trial counsel sought a brief trial continuance and leave to designate additional expert witnesses, effectively reopening discovery. At the time, the parties were still engaged in heavily disputed discovery exchanges. The trial court continued the trial date and allowed Hakenjos Hall to designate a retained damages expert, but when it did so, it ensured that Schwartz had the opportunity to depose the expert prior to trial and required Hakenjos Hall to pay deposition costs. This gave Schwartz the ability "to recover from any disadvantage caused by permitting [Hakenjos Hall] to call a new expert." (*Dickison, supra*, 220 Cal.App.3d at p. 1479.)

Based on the record and the extensive discovery disputes between the parties, which had already delayed the trial, it is also apparent that, had Hakenjos Hall pursued the same relief by noticed motion, it is reasonably probable the result would have been the same: the trial court would have allowed Hakenjos Hall to reopen discovery to amend their expert witness list to designate a retained damages expert. The trial court had already

indicated its intention to allow the parties to fully present their cases by appointing a discovery referee to ensure fair and full discovery and by granting the parties' repeated requests to continue trial. At the ex parte hearing, the trial court again articulated the importance of providing a full and fair trial on the merits. Under the circumstances, the trial court likely would have concluded prior counsel's illness and the substitution of new counsel justified the reopening of discovery, newly substituted counsel was diligent in seeking relief, and reopening discovery would further the interests of justice and would not result in undue prejudice to Schwartz. (See § 2024.050, subd. (b).) Moreover, the trial court likely would have concluded prior counsel's failure to previously designate a retained expert was reasonably attributable to the parties' continued discovery disputes, and that new counsel was exercising due diligence in seeking a trial continuance and additional time to designate a damages expert. (§ 2034.620.) The trial court clearly determined there was good cause to briefly delay trial, to allow Hakenjos Hall to designate and prepare an expert witness, and to allow Schwartz to prepare for the newly designated expert. (See *Richaud*, *supra*, 16 Cal.App.4th at p. 92.) Moreover, the trial court granted the request in a manner to mitigate any prejudice to Schwartz. (§ 2034.620, subd. (b).) Based on this record, we conclude any error was harmless because it is not reasonably probable that Schwartz would have achieved a more favorable result had Hakenjos Hall followed the applicable statutory procedures to reopen discovery and to amend or augment expert witness information. (§§ 2024.050, 2034.610.)

The Schwartz parties cite *Fairfax v. Lords* (2006) 138 Cal.App.4th 1019 to support their claim of prejudice. In that case, however, the defendant deliberately refrained from participating in the simultaneous exchange of

35

expert witnesses to gain an unfair advantage. (*Id.* at pp. 1026-1027; see *Du-All Safety, LLC v. Superior Court* (2019) 34 Cal.App.5th 485, 501-502 [distinguishing *Fairfax* on the ground that the defendant there admitted that his "wait to see approach was 'his express intent' [citation], indicating what could be considered gamesmanship"].) By contrast, Hakenjos Hall's new counsel promptly brought their need to designate a damages expert to the trial court's attention, and the court gave the parties additional time to prepare for trial and depose experts. Hakenjos Hall did not engage in the type of "gamesmanship" present in *Fairfax* and did not receive an unfair advantage as a result of the court's actions. Allowing Hakenjos Hall to designate a damages expert was not prejudicial to Schwartz, but rather served to avoid a miscarriage of justice and allow the parties to try their case on the merits. (*Bonds*, *supra*, 20 Cal.4th at pp. 146-147 [expert witness discovery statute is intended "to give fair notice of what an expert will say at trial" and late disclosure " 'should be permitted, with appropriate safeguards and limits, only when absolutely necessary to avoid a miscarriage of justice' "]; *Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 342, 353 [trial court's ruling allowing defendant's late designation of expert witnesses did not provide a basis for granting a new trial where any assumed error did not result in a miscarriage of justice].)

Given our conclusion that the Schwartz parties were not prejudiced by the trial court's ruling, we need not consider Hakenjos Hall's argument that the parties were exempt from complying with the statutory provisions governing expert discovery procedures because the court adopted a case management system in accordance with the Government Code and rules of

court. (Gov. Code, § 68603, subd. (c), Cal. Rules of Court, rule 3.700, et seq.)[30]

## II

*The Damages Award Is Supported by Substantial Evidence*

A. *Additional Background*

Evidence of the income and expenses for Martin's business during the period from January 2008 through April 2011 was presented at trial. Evidence established that, under Martin's management, the bookkeeping and tax preparation business enjoyed a profit margin of 42 percent in 2008, 39 percent in 2009, 47 percent in 2010, and 66 percent during the period from January through April 2011. Martin testified that a return of 47 percent was "achievable with the number of clients [he] had as of the end of 2010," and he represented to Carl during their negotiations that these were realistic figures. Hakenjos Hall purchased the business in early 2012, and Carl

---

[30] Specifically, Hakenjos Hall contends, "Under the local rules permitted under those sections, trial courts in San Diego County propose expert exchange dates that become the subject of the trial court's case management order, rather than having the litigants exchange expert disclosure demands pursuant to [section] 2034.010." However, the applicable local rules expressly state that "[a]lthough the demand requirement of that section may be dispensed with at [the parties' case management conference] hearing, all other provisions of Code of Civil Procedure section 2034.210 et seq. will be strictly enforced by the court." (Super. Ct. San Diego County, Local Rules, rule 2.1.11.) Additionally, the local rules provide that they "are at all times supplementary to and subject to statutes, the California Rules of Court, and any rules adopted by the Judicial Council and are to be construed and applied so they do not conflict with such rules and statutes." (*Id.*, rule 1.1.1; see *Wagner v. Superior* Court (1993) 12 Cal.App.4th 1314, 1319-1320 [local rule did not authorize trial court to set discovery cutoff date in advance of setting trial date, which would conflict with parties' statutory right to conduct discovery up to 30 days before initial trial date].)

testified the business remained profitable from 2012 through 2014, but in 2015—after Martin left—it was not profitable.[31]

Hakenjos Hall used a lost profits model to estimate damages from 2014 through 2022 (the duration of the noncompete agreement). Carl testified his damages were derived from "revenues that Martin realized from clients that he serviced which were a breach of our contract." He reasoned that, "[i]f Martin had not directed them to him, they would have come to me."[32] He compiled spreadsheets reflecting the revenues Martin earned from the disputed clients after he departed from Hakenjos Hall's firm, whether those clients obtained services for tax, bookkeeping, audit, or other services.[33]

Using the spreadsheets reflecting Martin's revenue data and applying an assumed profit margin of roughly 45 percent, Hakenjos Hall's damages expert Lauer opined that Hakenjos Hall had suffered lost profits totaling $1,643,418 for the period 2014 to 2022. The assumed profit margin of 45 percent was derived from Martin's estimated profit margins during the 2010-2012 period.

Schwartz's expert accountant Bergmark criticized Lauer's reliance on Carl's spreadsheets and further criticized the application of a 45 percent

---

[31] Carl testified he was unaware of the specific profit margins earned following his purchase of the business, and he did not present evidence of these profit margins at trial.

[32] Carl further explained that, when he was considering purchasing the business, the client list was "very appealing" to him because most had been clients for 20-30 years and were "likely going to stay" with the company.

[33] The spreadsheets indicated most of the revenues were derived from Schedule A clients. A smaller portion of revenues were derived from clients residing within a 25-mile radius of the La Mesa office building or those who had been a Hakenjos Hall client. For ease of reference, we refer to all these clients as the "disputed clients."

profit margin. Bergmark posited that a reasonable profit margin for an accounting firm like Hakenjos Hall was 25 percent, the national average for a firm about the same size. Applying this profit margin to the spreadsheet data compiled by Carl (which Bergmark criticized was inflated because Hakenjos Hall could not assume that he would have kept all the disputed clients), Bergmark reduced the estimated damages from Lauer's $1.6 million to $937,000.

The jury was instructed on calculating lost profits where no profits are earned as a result of a defendant's breach of contract. The instruction provided as follows:

> "To recover damages for lost profits, the plaintiffs must prove that it is reasonably certain they would have earned profits but for the defendants['] breach of the contract. [¶] To decide the amount of damages for lost profits, you must determine the gross, or total, amount the plaintiffs would have received if the contract had been performed and then subtract from that amount the costs associated with operating the business the plaintiffs would have had if the contract had been performed. [¶] You do not have to calculate the amount of the lost profits with mathematical precision, but there must be a reasonable basis for computing the loss." (See CACI No. 352.)

The jury was also instructed on calculating lost profits where some profits were earned. The instruction provided as follows:

> "To recover damages for lost profits, the Hakenjos plaintiffs must prove that it is reasonably certain they would have earned more profits but for the Schwartz defendants' breach of the contract.
>
> "To decide the amount of damages for lost profits, you must:
>
> "1. First, calculate Hakenjos plaintiffs['] estimated total profit by determining the gross amount they would have received if the contract had been performed, and then

39

subtracting from that amount the costs associated with the operation of the business that the Hakenjos plaintiffs would have had if the contract had been performed;

"2. Next, calculate the Hakenjos plaintiffs['] actual profit by determining the gross amount they actually received, and then subtracting from that amount the Hakenjos plaintiffs['] actual costs of operating the business; and

"3. Then, subtract the Hakenjos plaintiffs' actual profit, which you determined in the second step, from their estimated total profit, which you determined in the first step. The resulting amount is the Hakenjos plaintiffs' lost profit.

"You do not have to calculate the amount of the lost profits with mathematical precision, but there must be a reasonable basis for computing the loss.

"In regard to [N]os. 1, 2, and 3, you may, but are not required to, accept the witness's calculations in this regard." (See CACI No. 353.)[34]

The jury found that the damages to Hakenjos Hall for the breach were "loss of profits from [noncompete] and goodwill breach" and awarded Hakenjos Hall $1,068,234 in damages for Schwartz's intentional interference with contractual relations.

B. *Applicable Law*

The California Supreme Court set forth the standard for lost business profits in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*). "Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses." (*Id*. at p. 774; see *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739,

---

[34]    Some language in this jury instruction (CACI No. 353) was modified without objection, including the addition of the final paragraph. Neither party has asserted any error on appeal regarding the jury instructions.

40

762-763 (*Greenwich*) [lost profits are frequently deemed uncertain and speculative where the business that claims them was a new venture].) " 'Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision. [Citations.] Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits. [Citations.] In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions.' " (*Sargon*, at p. 774.)

" 'On the other hand, where the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations.] . . . But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' " (*Sargon*, *supra*, 55 Cal.4th at p. 774; see *Greenwich*, *supra*, 190 Cal.App.4th at p. 766 [rejecting real property developer's lost profits as uncertain and speculative].)

" 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.] This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have

41

caused the other party to not realize a profit to which that party is entitled.' " (*Sargon*, *supra*, 55 Cal.4th at pp. 774-775.)

"Courts must not be too quick to exclude expert evidence as speculative merely because the expert cannot say with absolute certainty what the profits would have been.  Courts must not eviscerate the possibility of recovering lost profits by too broadly defining what is too speculative.  A reasonable certainty only is required, not absolute certainty." (*Sargon*, *supra*, 55 Cal.4th at p. 775.)

"The amount of damages is a fact question, committed first to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078 (*Westphal*).)  We review a contention that evidence does not support a damage award under the substantial evidence standard of review. (*Yassin v. Solis* (2010) 184 Cal.App.4th 524, 529.)  We accept all evidence which supports the prevailing party, disregard the conflicting evidence, and draw all reasonable inferences to uphold the verdict.  (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1203, fn. 1.)  "In assessing a claim that the jury's award of damages is excessive, we do not reassess the credibility of witnesses or reweigh the evidence.  To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor." (*Westphal*, at p. 1078.)

C.  *Analysis*

Schwartz contends that we must reject the jury's damages award as unsupported by substantial evidence because the lost profits damages model was uncertain and speculative.  We disagree.

Schwartz claims "Hakenjos' track record as a CPA was short, decidedly mixed, and barren of any data about profit" and argues there is insufficient

42

evidence of prior performance of the business with Carl in charge.[35] But the evidence showed that, in 2012, Hakenjos Hall purchased Schwartz's long-established bookkeeping and tax preparation business, including its office, client lists, staff, supplies, and goodwill. The business had an established book of business and a track record of success, which Martin touted when he advertised the business for sale. Martin had advertised profit margins ranging from 39 to 47 percent for the years preceding the sale and testified at trial that a return of 47 percent was "achievable with the number of clients [he] had as of the end of 2010." During the time that Martin stayed with the business as an employee, Hakenjos Hall's business remained profitable. However, after Martin left—and opened his own, competing business to provide services to a substantial number of Schedule A clients—Hakenjos Hall's business suddenly was no longer profitable. Based on this record, we conclude there is substantial evidence of prior performance to support the lost profit damages. (See *Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 975 (*Asahi*) [upholding lost profit damages where the business "does not fit neatly into the established business versus new business paradigm"]; *Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 382, 398-399 (*Orozco*) [substantial evidence supported occurrence of lost profits damages given testimony that defendant's business was profitable for five months prior to opening of competitor's business, and "testimony that

_____

35     Schwartz also claims the trial court found, in its statement of decision on equitable issues, that Lauer's lost profit model "could not *possibly* support a seven-digit award." This grossly mischaracterizes the trial court's statement, which was that the jury's damages award clearly covered past and future damages spanning the entire 10-year contractual term, as evidenced by the fact that "[t]here was no evidence to support an award of over a million dollars in damages based upon 5 or even 6 years of damages."

opined that lost profits could be projected forward through the life of the [10-year] lease"].)

"Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits. [Citations.] In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions. [Citations.] In either case, recovery is limited to net profits." (*Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 162.) Hakenjos Hall posited that an estimate of lost profits could be derived from Martin's revenues obtained from Schedule A and other disputed clients. Carl reasoned that those clients would have remained his clients had they not migrated to Martin's new business, and further reasoned that, by applying a reasonable profit margin to the revenues Martin obtained from Schedule A and other disputed clients, he could estimate the profits he lost as a result of Martin's interference. His expert applied a profit margin previously claimed by Martin for the same business he sold to Hakenjos Hall; the expert applied this profit margin to this data and estimated damages. Altogether, the evidence provided the jury with sufficiently reliable information from which it could reasonably estimate "the gross, or total, amount [Hakenjos Hall] would have received if the contract had been performed" and "the costs associated with operating the business the plaintiffs would have had if the contract had been performed," consistent with the jury instructions. (See CACI Nos. 352 & 353.)

Schwartz had the opportunity to cross-examine Hakenjos Hall's expert regarding his reliance on the data provided by Carl as well as the propriety of applying a 45 percent profit margin to estimate lost profits. Schwartz's own expert testified regarding these issues, argued that an estimated 45 percent profit margin was too high, and opined that a more reasonable profit margin

44

for a business like Hakenjos Hall would be 25 percent—yielding a lost profit estimate just under $1,000,000 when applied to Hakenjos Hall's data. The jury had the opportunity to give all the evidence presented the weight it believed it deserved. Indeed, the jury awarded damages in an amount significantly lower than Lauer's estimate and much closer to the estimate of Schwartz's own expert. The amount of damages is a fact question for the jury to decide, and we do not reassess the credibility of witnesses or reweigh the evidence. (*Westphal*, *supra*, 68 Cal.App.4th at p. 1078.) Moreover, where, as here, "the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty." (*Sargon*, *supra*, 55 Cal.4th at p. 774.) Viewing the evidence in the light most favorable to the judgement, we conclude the evidence established a reasonable basis for computing damages. (*Id*. at pp. 774-775.)

Schwartz contends that Hakenjos Hall's damages theory was flawed for the same reasons as the lost profit theory that was rejected in *Greenwich*. That case involved the breach of an agreement to convey real property to a buyer who intended to renovate and sell the property at a profit. (*Greenwich*, *supra*, 190 Cal.App.4th at p. 743.) The jury awarded $600,000 to the buyer, a real estate developer. (*Ibid*.) On appeal, the court held that lost profits could be awarded as a component of consequential damages for such a breach "upon a proper showing" (*id*. at p. 758), but rejected the lost profits awarded in that case as unduly speculative and uncertain as a matter of law (*id*. at pp. 759-760, 766). The *Greenwich* court found that the lost profits claim was based on the faulty assumption that the developer would have constructed a residence according to plans and specifications without changes and that the venture would have been profitable, but the facts established that the

45

proposed development project involved "numerous variables that made any calculation of lost profits inherently uncertain." (*Id*. at p. 766.)

By contrast, Hakenjos Hall purchased an established business that suffered a loss of profits when Martin opened a competing business that serviced Schedule A and other disputed clients in violation of his agreement not to. Hakenjos Hall and their expert estimated that Carl's profits would have been similar to those Martin derived from the disputed clients and used that data, combined with an assumed profit margin based on historical data offered by Martin himself when selling the business, to estimate future lost profits from the ongoing operation. Recognizing that "[t]he lost profit inquiry is always speculative to some degree" and "there will always be an element of uncertainty," we conclude this damages model provided the reasonable certainty required under the law. (*Sargon*, *supra*, 55 Cal.4th at p. 775 ["A reasonable certainty only is required, not absolute certainty."].)

Schwartz proposes other ways to measure damages—including using Martin's profits, profit margins, and costs after 2014; Hakenjos Hall's profits, profit margins, and costs from 2014-2017; or Hakenjos Hall's "track record of profitability" prior to 2012. But the existence of possible alternative analyses does not show the jury's verdict is unsupported by substantial evidence. Schwartz's insistence on using these other metrics is not persuasive based on the specific business at issue here and the evidence presented at trial. As noted, Hakenjos Hall purchased an established, profitable business with documented revenues, profit margins, and costs. Hakenjos Hall's purchase included a list of established clients which Martin acknowledged was sufficient to generate a profit margin of 47 percent. It was reasonable to infer that Hakenjos Hall would continue to achieve comparable profits and incur comparable costs, and that any shortfall in profits Hakenjos experienced after

Martin's departure was partly due to Martin's violation of the noncompetition restrictions. The Schwartz parties admit a plaintiff can rely on data from other enterprises if the plaintiff establishes they operate under similar conditions. It was up to the jury to determine whether the operations here were sufficiently similar to generate a profit margin of 45 percent, and substantial evidence supports the jury's conclusion on this point.[36] (See *Rony v. Costa* (2012) 210 Cal.App.4th 746, 754 [" 'The evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure.' "]; *Asahi*, *supra*, 222 Cal.App.4th at p. 972 ["It is for the jury to determine the probabilities as to whether damages are reasonably certain to occur in any particular case."].) To the extent there is some contrary evidence in the record—for example, that Carl did not provide the same level of service to his clients—we reject the Schwartz parties' invitation to draw inferences in their favor. (*Orozco*, *supra*, 36 Cal.App.5th at p. 400.)

Schwartz also contends the trial court erred by denying their motion for a new trial based on allegedly excessive damages, which relied on the same arguments described above. Schwartz does not separately address this motion, which we review under the more deferential abuse of discretion standard of review: "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Jiminez v. Sears* (1971) 4 Cal.3d 379, 387; accord, *Lee v. West Kern Water*

---

[36] Martin contends his current operations are much different, because he has a smaller office, fewer clients, and many fewer employees. But Hakenjos Hall was not purchasing Martin's current business and these differences therefore are not pertinent to Schwartz's claim that the verdict is not supported by substantial evidence.

47

*Dist.* (2016) 5 Cal.App.5th 606, 623.)[37]  Under these circumstances, for the same reasons as described *ante*, we conclude Schwartz has not shown the court abused its discretion by denying Schwartz's motion for a new trial. "[A]s we have already explained, substantial evidence supported the jury's verdict.  Thus, we conclude that both [the judgment notwithstanding the verdict and new trial] motions were properly denied." (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514.)

In sum, after reviewing the whole record "in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor" we conclude that there is sufficiently substantial evidence to support the jury's verdict.  (*Westphal*, *supra*, 68 Cal.App.4th at p. 1078.)  We therefore conclude the trial court did not abuse its discretion by denying Schwartz's motion for a new trial on damages.

III

*Substantial Evidence Supports the Jury's Determination that the*
*Schwartz Parties Committed the First Material Breach*

Schwartz contends the jury's determination that "the Schwartz parties"—not Hakenjos Hall—committed the "first material breach" of the parties' agreement is not supported by substantial evidence, and the trial

---

[37]    Schwartz suggests this deferential standard of review does not apply because the judge who ruled on the new trial motion did not preside over the trial.  Schwartz cites no authority to support this argument and we reject it. (See *People v. Moreda* (2004) 118 Cal.App.4th 507, 517-518 ["a judge who did not personally hear testimony at trial may nevertheless make an adequate independent assessment of the evidence in the record in order to determine whether the weight of the evidence supports the jury's verdict"].)  Regardless, as discussed, we have reviewed the record and conclude substantial evidence supports the jury's damages award.

court accordingly erred when it denied Schwartz's posttrial motion for judgment notwithstanding the verdict. (§ 629.)

To prevail on a breach of contract claim, the plaintiff must prove the existence of the contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and the resulting damages to the plaintiff. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) Only a material breach of the parties' agreement may relieve the other party from its duty to perform under the contract. (See *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277-278.) The question of whether a party's breach of an obligation is a material breach, sufficient to excuse performance by the other party, is a question of fact. (*Ibid*.)

We review the jury's determination that the Schwartz parties committed the first material breach for substantial evidence. (*Ash v. North American Title Co.* (2014) 223 Cal.App.4th 1258, 1268; *Ladd v. Warner Bros. Entertainment, Inc.* (2010) 184 Cal.App.4th 1298, 1307-1308.) "When we consider whether the evidence was sufficient to support the jury's verdict, we review the entire record in the light most favorable to the judgment to determine whether there are sufficient facts, contradicted or uncontradicted, to support the judgment. [Citation.] Substantial evidence is evidence that is reasonable and credible. In evaluating the evidence, we accept reasonable inferences in support of the judgment and do not consider whether contrary inferences may be made from the evidence." (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 462-463.) "As in all appeals, the appellant has the burden to show, through analysis and citation to the record, that no substantial evidence supports the [jury verdict]." (*Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 514.)

49

" ' "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] . . . As in the trial court, the standard of review [on appeal] is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." ' " (*Webb v. Special Electric Co., Inc*. (2016) 63 Cal.4th 167, 192 (*Webb*).) "We, like the trial court, may not reweigh the evidence or judge the credibility of witnesses. ' " ' "If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied . . . ." ' " ' " (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 313-314.)

Initially, we note that the evidence clearly establishes that Schwartz opened a competing business and provided services to Schedule A clients in violation of Schwartz's agreement not to do so. Schwartz does not dispute that Martin failed to perform under the contract. At trial, Martin admitted as much. What Schwartz disputes is the jury's determination that they committed the *first* material breach. Schwartz contends that "all of the evidence [at trial] was to the effect Hakenjos [Hall] failed utterly to operate the business in a professional manner long before Martin's departure in May 2014." We disagree. Viewing the evidence in the light most favorable to Hakenjos Hall, we conclude the verdict is supported by substantial evidence and further conclude the trial court properly rejected Schwartz's motion for judgment notwithstanding the verdict. (See *Webb*, *supra*, 63 Cal.4th at p. 192.)

Contrary to Schwartz's assertion, the evidence at trial was not uncontradicted that Carl "failed utterly to operate the business in a professional manner." Although Hakenjos Hall made some errors in

50

servicing clients, the jury could reasonably conclude that the mistakes were short-lived and largely a result of the departure of two longstanding staff members.[38]  Based on Martin's and Jacob's own testimony—acknowledging they too made mistakes in servicing clients—the jury could conclude that errors committed by Carl did not necessarily violate the professionalism provision in the parties' agreement, particularly where Carl took steps to remedy the mistakes.[39]

Even accepting Schwartz's premise that Carl failed to operate the business in a professional manner, the jury still could reasonably conclude that the services Carl provided *to his own clients* did not constitute a material breach *as to the Schwartz parties*.  The jury was instructed a party's failure to perform under a contract could "result in either a partial or material breach of the contract," and that "a partial, non-material breach of the contract by one party does not justify termination of the contract by the other party."  The jury was further instructed that only a material breach—one "that strikes so deeply at the heart of the contract that it renders the agreement 'irreparably broken' and defeats the purpose of making the contract in the first place"—entitled a party to end the agreement.[40]  Here, the "professionalism" provision was boilerplate language from a preprinted template that was never even discussed between the parties when they

---

[38]    As discussed *ante*, the individual who was hired after the departure of these employees turned out to be inexperienced and responsible for many of the errors discussed at trial.  Carl acknowledged that he was ultimately responsible for remedying the situation, and he took steps to do so after the errors were discovered.

[39]    Martin and Jacob both testified that, although they made some mistakes, they still believed they performed in a professional manner.

[40]    Schwartz does not contend these instructions were erroneous.

negotiated the sale of the business. Although Martin continues to contend it was Carl's failure to maintain an adequate level of professionalism that prompted Martin's departure and breach of the noncompete agreement, at trial he was unable to recall a time he expressed to Carl any concerns of unprofessional performance. Nor was the jury required to accept Martin's testimony that the professionalism provision was "[v]ery important" to him. Carl testified that Martin never expressed any concern that Carl was not performing professionally until *after* Martin had left their practice and "lawyers got involved." This was true even though Martin claimed he had concerns regarding Carl's professionalism as early as six months to a year after the sale of the business—i.e., as early as June 2012 to January 2013. Both Martin and Jacob acknowledged they met with an attorney around the time of Martin's departure in May 2014—at least 16 months after Martin claimed he first was concerned about Carl's lack of professionalism—and Jacob testified that their views regarding the noncompetition restrictions changed at that time. Given this evidence, the jury could view Schwartz's assertion—that he truly believed he was justified in breaching the agreement because Carl breached it first—with skepticism. Alternatively, the jury could have concluded that any prior breach by Carl was not material because Carl took adequate steps to remedy any deficiencies in his performance. Pursuant to the trial court's instructions, the jury could conclude Martin would "obtain the substantial benefit which he could have reasonably anticipated" under the contract—particularly when he already received nearly $2 million cash for the Schedule A clients—and it could further determine that Carl's conduct was not "willful" but rather "negligent or innocent" in providing any deficient services to Hakenjos Hall's own clients.

Schwartz further argues there was no substantial evidence to support Hakenjos Hall's tort claim for interference with contractual relations. To prevail on this claim, Hakenjos Hall was required to prove (1) there was a contract between Hakenjos Hall and the clients, (2) Schwartz knew of the contract, (3) Schwartz's conduct "prevented performance or made performance more expensive or difficult," (4) Schwartz intended to disrupt the performance of these contracts or knew that disruption of performance was substantially certain to occur, (5) harm, and (6) causation. (CACI No. 2201; see *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [setting forth the elements for intentional interference with contractual relations cause of action].) Schwartz contends they could not have interfered with Hakenjos Hall's contractual relations with Schedule A clients when it was the Schedule A clients who, they claim, "fired Hakenjos out of disgust and anger." Schwartz claims that, because the Schedule A clients left Hakenjos Hall, there was no existing contract with which they could interfere, and hence no cause of action for interference. However, Martin's own testimony established that many of the Schedule A clients continued to be clients of the business (Schwartz Hakenjos & Associates) after Schwartz transferred it to Hakenjos Hall; Martin himself continued to service those clients as Hakenjos Hall's employee. The evidence further established that many of these clients left Hakenjos Hall's business and followed Martin to his new business. This supports the jury's determination that Martin intentionally disrupted the relationship between these clients and Hakenjos Hall when he left to open his own, competing business.

In sum, while there was evidence of mistakes made under Carl's supervision, whether those mistakes constituted unprofessional conduct or

constituted a material breach of the parties' agreement were questions for the jury to decide. The jury clearly rejected Schwartz's position when it concluded that the Schwartz parties were the ones who first materially breached the parties' agreement and, viewing the evidence in the light most favorable to Hakenjos Hall, there is substantial evidence supporting the jury's verdict on both the breach of contract and intentional interference with contractual relations causes of action. (See *Webb*, *supra*, 63 Cal.4th at p. 192.)[41]

## IV

*No Error in Enforcing the Promissory Note to Offset the Judgment*

Schwartz and Hakenjos Hall each challenge portions of the trial court's rulings relating to the promissory note. Schwartz contends the trial court correctly ruled that Hakenjos Hall failed to make payments required under the promissory note, but the court erred in failing to also enforce the security agreement and deed of trust which secured the note. In response, Hakenjos Hall contends the trial court did not have the power to enforce the promissory note at all, but if it did, the court did not abuse its discretion in offsetting the amount owed under the note against the verdict, and once that occurred the

---

[41] The Schwartz parties cite evidence supporting their position that Carl committed the first material breach, including testimony from several third party witnesses, and contend it is "impossible" for the jury to have reached a contrary conclusion. However, " ' "[O]ur role on appeal is a limited one." [Citation.] Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. [Citation.] Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.' " (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) Under this standard, the jury's verdict is supported by the evidence.

security agreement and deed of trust were no longer enforceable. We conclude the trial court did not err in applying an offset under the circumstances of this case.

A. *Additional Background*

As previously indicated, in connection with the purchase agreement, KSI agreed to carry a promissory note in the amount of $259,375 "to be paid by the buyer" starting the third year after closing.[42] The promissory note was secured by a security agreement and a deed of trust on the La Mesa office building. The security agreement specified that nonperformance or nonpayment of the note would constitute a default under the agreement. KSI was listed as the "secured party" on the security agreement and the beneficiary under the deed of trust. The security agreement stated that, upon the occurrence of any default, the secured party (KSI) "shall have any or all of the following rights and remedies: . . . [t]he right to immediate re-entry on the [p]remises [of the office building] and possession of the [c]ollateral; . . . [t]he right to appoint or have appointed a receiver to take possession of and operate the business . . . ; [and] [t]he right to declare the entire balance of the [n]ote due and payable . . . ." The deed of trust further provided that, in the event of default, including nonpayment, KSI could enter and take possession of the property to collect rents or profits and apply them to the indebtedness, or record a notice of default and proceed with foreclosure proceedings.

---

[42]    The agreement stated: "This note will pay interest at the rate of 8.0 [percent] and will have a term of seven years. For the first two years of this note's term, no payments will be made on the note but it will accrue interest payable to the seller in the amount of $20,750 each year. Repayment will begin in the first period of the third year following the closing and the payments will be in the amount of $6,084.17 per month. Payments will be due on the 5th day of each month for the five year[] repayment period."

At a pretrial hearing, the parties discussed the order in which the court should consider the legal and equitable claims. Hakenjos Hall asked the trial court to rule on equitable issues prior to empaneling a jury to consider any remaining legal issues, while Schwartz argued that a jury should first determine whether (and by whom) the contract was breached, and then the court should consider any remaining equitable issues. The trial court acknowledged its discretion to try the equitable issues first but found that the "gist of the action" was breach of contract, a legal issue. As such, the trial court ruled that the legal issues would go to a jury first, with the trial court deciding any remaining equitable issues after the jury trial. The trial court ruled that it—not the jury—would make all decisions as to equitable issues, and to the extent there was overlapping evidence, "the jury may render answers to advisory questions" and the court "may rely on the jury in regard to advisory questions." During the same pretrial hearing, the trial court explained that the parties could include "different questions on the verdict form" regarding the parties' respective breach claims and the promissory note in particular. However, this was not done; the verdict form which was jointly submitted by the parties did not include separate questions regarding the different alleged breaches.

During the jury trial, Carl acknowledged signing the promissory note, agreeing to pay $259,000, and acknowledged the note was secured by a security agreement and deed of trust on the La Mesa property. Carl acknowledged that he understood when he signed the note that if he defaulted, Martin would "be within his rights to foreclose and seize the property . . . ." The last time Carl made an installment payment on the promissory note was June 2, 2014.

As noted, the jury rendered a special verdict that neither of the parties did all or substantially all of the significant things that the contract required them to do, the "Schwartz parties" committed the first material breach of the contract; the damages to Hakenjos Hall due to the Schwartz parties' breach were "loss of profits from noncompete and goodwill breach." The jury awarded Hakenjos Hall damages of $1,068,234.

At the bench trial on equitable issues, the Schwartz parties sought equitable relief on the promissory note, deed of trust, and security agreement through the declaratory relief cause of action stated in their cross-complaint.[43]

The trial court issued a statement of decision on equitable issues in which it found that the jury's award of damages to Hakenjos Hall for the Schwartz parties' breach of contract was an election of remedies that precluded Hakenjos Hall from additionally obtaining a permanent injunction to enforce the contract (specifically, the noncompete clause). With regard to Schwartz's claim for declaratory relief on the promissory note, the trial court found that, although the parties entered into a single contract for the purchase and sale of the business, the contract was divisible, and the jury did

[43]    In their cross-complaint, the Schwartz parties sought a declaration that they were "entitled under the Security Agreement . . . as attorney-in-fact to take all actions which it deems advisable to protect the collateral or perfect its security interest . . . ." The Schwartz parties additionally sought "a declaration that the Security Agreement . . . authorizes [them] to perform accounting services for existing clients of [Hakenjos Hall] on a per-need basis to protect and/or perfect its secured interest." They prayed for an "[a]ward of possession of [the accounting business] and all physical and intangible properties therein, pursuant to [the] [s]ecurity [a]greement."

not decide liability on the promissory note.[44]  The trial court found that the price paid for the building was divisible from the price paid for the covenant not to compete.  It was undisputed that, except for one payment, Hakenjos Hall failed to make the payments due on the promissory note after Schwartz left the business.  The trial court observed that "[Hakenjos] offered no explanation for why payments for the building were withheld," and found that Schwartz's failure to abide by the covenant not to compete and distance agreement "do not eliminate [Hakenjos Hall's] duty to pay for the building." However, the trial court found that "it would be inequitable to require [Hakenjos Hall] to pay for interest, late charges, and penalty provisions, including a receivership, for his failure to pay at a time when his business was subjected to [Schwartz's] violation of the covenant not to compete . . . ."

The trial court found that the amount "due and owing" to KSI under the promissory note was $278,149.74.  This amount was calculated by subtracting credit for payments made by Hakenjos Hall ($22,725.26) from the principal amount ($259,375) and adding interest that accrued on the note prior to Martin's departure from the business ($41,500).  The trial court declined to add interest accrued after Martin's departure based on its finding it would be inequitable to do so.

Hakenjos Hall requested that the trial court offset the judgment in their favor with the payments they owed to Schwartz on the promissory note. Schwartz objected, arguing an offset was not appropriate because it was not previously requested in the parties' pleadings and requested an order

---

[44]    The trial court stated that "[t]he damages were awarded for the specific items as set forth in the contract, and according to the verdict, damages were awarded in regard to those items only.  The jury determined the full measure of damages for the loss of profits from the covenant not to compete and the goodwill breach."

requiring Hakenjos Hall to continue making payments. Schwartz stated, "[i]f they default in the making of the payments . . . we will be back here and we will be asking for a receivership and other things."

When the trial court entered its final judgment, it indicated that the balance "due and owing" under the promissory note ($278,149.74) would be set off against the judgment owed by the Schwartz parties and would constitute payment in full, with no further balance due under the promissory note.

B. *Standard of Review*

We review questions of law, including those regarding the interpretation and construction of a contract, de novo. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*); *Thee Aguila, Inc. v. Century Law Group, LLP* (2019) 37 Cal.App.5th 22, 27.) We apply a substantial evidence standard of review to the trial court's findings of fact made in support of a statement of decision following a bench trial. (*Thompson*, at p. 981.) "Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Ibid*.) We " 'must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Ibid*.) We review the trial court's exercise of its equitable powers under an abuse of discretion standard of review. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256 (*City of Barstow*); *Crasnick v. Marquez* (2016) 248 Cal.App.4th Supp. 1, 7 (*Crasnick*) [" 'Whether a setoff is appropriate in equity is a question within the trial court's discretion.' "].) " 'An abuse of discretion occurs if, in light of the applicable law and

59

considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice." (*Crasnick*, at p. 7.)

C.  *Schwartz's Claims*

Schwartz does not challenge the court's ruling that the promissory note was enforceable; instead, Schwartz contends the security agreement and deed of trust should have been enforced too.[45]  We agree with Schwartz that the promissory note was enforceable.  However, we disagree with Schwartz's remaining contentions.  As discussed below, once the trial court offset the amount due under the promissory note against the jury's verdict in favor of Hakenjos Hall, the promissory note was paid and the security agreement and deed of trust no longer served any effective purpose.

"[E]quitable offset is a means by which a debtor may satisfy in whole or in part a judgment or claim held against him out of a judgment or claim which he has subsequently acquired against his judgment creditor.  The right exists independently of statute and rests upon the inherent power of the court to do justice to the parties before it." (*Salaman v. Bolt* (1977) 74 Cal.App.3d 907, 918.)  " '[I]t is well settled that a court of equity will compel a set-off when mutual demands are held under such circumstances that one of them should be applied against the other and only the balance recovered.' " (*Ibid.*)

Exercising its discretion here, the trial court determined that the balance due under the promissory note would be set off against the judgment owed by the Schwartz parties and would constitute payment in full, with no further balance due thereunder from Hakenjos Hall to KSI.  The court did not

---

45    Specifically, Schwartz insists the trial court should have ordered Hakenjos Hall to forfeit possession of the office building and appoint a receiver.

abuse its discretion. There was no dispute that Hakenjos Hall failed to pay amounts due under the promissory note, and substantial evidence supports the trial court's finding that there was no justification for this failure. There were mutual obligations owed by the parties—Schwartz owed $1,068,234 pursuant to the jury's verdict and Hakenjos Hall owed $278,149.74 under the promissory note. The trial court had the authority to set off these amounts under established precedent. Our Supreme Court has held: "[I]t is well settled that a court of equity will compel a set-off when mutual demands are held under such circumstances that one of them should be applied against the other and *only the balance recovered*." (*Harrison v. Adams* (1942) 20 Cal.2d 646, 648-649, italics added; see *Am. Nat. Bank v. Stanfill* (1988) 205 Cal.App.3d 1089, 1097 ["Setoff is an appropriate defense to an action on a promissory note."].) The only remaining balance recoverable here was the net difference of $790,084.30 owed by Schwartz.

Schwartz's contention that the security agreement and the deed of trust also should have been enforced is unpersuasive. These documents secured Hakenjos Hall's obligation to pay under the promissory note. However, once the court exercised its equitable power to apply an offset, there was no longer any amount due under the promissory note. (*Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172, 1204-1205 (*Colaco*) [where plaintiff's right to recover $2 million from defendant on the complaint was offset against defendant's right to recover approximately $1.3 million from plaintiff on its cross-complaint, it "effectively pays [plaintiff's] liability in full" and leaves defendant owing plaintiff "a net amount" of approximately $700,000 on the complaint].) Because there was no longer any payment obligation to secure, the trial court properly determined that Schwartz was no longer entitled to any other remedies under the security agreement and deed of

trust as they were no longer effective. (See *Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 559-560 [a security interest presupposes the existence of a debt and cannot exist without an underlying obligation]; *Winnett v. Roberts* (1986) 179 Cal.App.3d 909, 922 ["As a deed of trust exists only as long as there is a valid trust purpose [citation], plaintiffs' payment in full of the underlying debt also discharged both the obligation and the security."].)[46]

Schwartz contends this result improperly "write[s] out" their other remedies under the security agreement and deed of trust. But Schwartz was no longer able to pursue these remedies as a result of section 726.

---

[46] In their reply brief, the Schwartz parties challenge the amount of the offset, claiming the trial court did not account for over $124,000 of unpaid interest. The Schwartz parties forfeited this claim by failing to raise it in their opening brief. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.) Even setting aside this forfeiture, Schwartz's contention fails. In applying an equitable offset, "the court was required to weigh the respective equities in the case." (*Crasnick, supra*, 248 Cal.App.4th Supp. at p. 6.) The trial court found that, while Hakenjos Hall was obligated to pay under the promissory note, "it would be inequitable to require [Hakenjos Hall] to pay for interest, late charges, and penalty provisions, including a receivership, for [its] failure to pay at a time when [its] business was subjected to [Schwartz's] violation of the covenant not to compete" and declined to impose interest or penalties for missed payments. This was a proper exercise of the court's broad discretion given the evidence at trial suggesting that Martin's departure from the business—and contemporaneous breach of the noncompete agreement—played a role in rendering Hakenjos Hall's accounting practice unprofitable. (*City of Barstow, supra*, 23 Cal.4th at p. 1256 [applying abuse of discretion standard of review to trial court's equitable determinations]; *Thompson, supra*, 6 Cal.App.5th at p. 981 [applying substantial evidence standard of review to the trial court's findings of fact made in support of a statement of decision following a bench trial].) The court's ruling prevented future disputes arising from the note, deed of trust, and security agreement and finally resolved the matters between the parties, furthering the interests of justice and judicial economy without violating any cognizable rights of the parties.

Section 726, subdivision (a) provides: "There can be but one form of action for the recovery of any debt or the enforcement of any right secured by mortgage upon real property or an estate for years therein . . . ."[47] As construed by case law, section 726 encompasses both a "one form of action" and a "security first" rule. (*Kinsmith Financial Corp. v. Gilroy* (2003) 105 Cal.App.4th 447, 453.) Under the one form of action rule, "[a] secured creditor can bring only one lawsuit to enforce its security interest and collect its debt" (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 997 (*Wozab*))—a foreclosure proceeding. (*Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1396 [the "one form of action is a foreclosure action"].) Under the " 'security first' rule[, a] secured creditor must 'rely upon his security before enforcing [the] debt.' " (*Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 691.) Section 726 can be invoked in two ways, as an affirmative defense or as a sanction. (*Walker v. Community Bank* (1974) 10 Cal.3d 729, 734 (*Walker*) ["section 726 is susceptible of a dual application—it may be interposed by the debtor as an affirmative defense or it may become operative as a sanction"].)

Here, there is no record of Hakenjos Hall asserting section 726 as an affirmative defense, nor did Hakenjos Hall demand foreclosure during the course of the trial. Nonetheless, the statute may still be invoked as a "sanction" given Schwartz's election of remedies. (*O'Neil v. General Security Corp.* (1992) 4 Cal.App.4th 587, 597 [discussing "two distinct ways" to invoke § 726].) As explained by our Supreme Court in *Walker*, "where [a] creditor sues on [an] obligation and seeks a personal money judgment against the debtor without seeking therein foreclosure of such . . . deed of trust, he makes

---

[47] For purposes of section 726, a deed of trust is treated as a mortgage. (*Bank of California v. Leone* (1974) 37 Cal.App.3d 444, 447.)

63

an election of remedies, electing the single remedy of a personal action, and thereby waives his right to foreclose on the security or to sell the security under a power of sale." (*Walker, supra*, 10 Cal.3d at p. 733.) Similarly, in *Scalese v. Wong* (2000) 84 Cal.App.4th 863, 869, the Court of Appeal held that "[i]n the event the creditor proceeds personally against the debtor without first exhausting the security, and the debtor does not object, the creditor has lost any further security interest in the property." By filing this action, rather than initiating foreclosure proceedings, the Schwartz parties selected their single remedy and cannot now invoke the security agreement and deed of trust. They have "for all time waived [their] right to have the property serve as security for the note." (*Id.* at p. 870; see *Passanisi v. Merit-Mcbride Realtors, Inc.* (1987) 190 Cal.App.3d 1496, 1506 [section 726 applies "where the creditor-beneficiary has brought an action against the debtor-trustor to recover a debt or to enforce some right secured by a deed of trust"].)[48]

---

[48] The underlying debt, however, was not extinguished as a result of Schwartz's election of remedies. (*Wozab, supra*, 51 Cal.3d at p. 1002.) Schwartz further contends that Hakenjos Hall's "dirty hands" barred him from "asserting any defense to the possession" of the property. But as we have discussed, the Schwartz parties are not entitled to possession of the property as a result of their election of remedies under section 726. Schwartz offers no authority showing the doctrine of unclean hands applies in this context. Moreover, the doctrine of unclean hands " 'is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of his claim.' " (*Mendoza v. Ruesga* (2008) 169 Cal.App.4th 270, 279.) The trial court did not find that Hakenjos Hall had unclean hands and Schwartz has not established that the court abused its discretion in this regard. (*City of Barstow, supra*, 23 Cal.4th at p. 1256 [applying abuse of discretion standard of review to trial court's equitable determinations].)

D. *Hakenjos Hall's Claims on Cross-appeal*

Hakenjos Hall contends the trial court did not have "jurisdiction" to grant declaratory relief with respect to the promissory note because the Schwartz parties did not request such relief in their pleadings. However, *Hakenjos Hall* affirmatively requested that the trial court offset the amounts due under the promissory note, stating: "[W]e believe obviously an offset is appropriate, not only appropriate, but mandated by the cases we've given[.]"[49] Hakenjos Hall therefore forfeited any alleged pleading defect. (*Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 392 [" 'Where the parties try the case on the assumption that . . . [an] issue . . . [is] raised by the pleadings, . . . neither party can change this theory for purposes of review on appeal.' "]; *Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 264 [issues not raised in the trial court cannot be raised for the first time on appeal].)[50]

Hakenjos Hall next argues that the Schwartz parties "elected [their] remedies" by submitting breach of contract issues to the jury prior to any determination on equitable issues and the jury's determination on legal issues was conclusive with respect to the promissory note. We disagree. The

[49]    After the trial court issued its tentative statement of decision on equitable issues, Hakenjos Hall objected on the grounds that Schwartz "elected to proceed with his legal claim" by submitting the breach of contract claim to the jury but did not object to the adequacy of the pleadings.

[50]    As noted in footnote 43, *ante*, the Schwartz parties' cross-complaint included a cause of action for declaratory relief relating to their secured interest in the property. Hakenjos Hall contends this was insufficient because Schwartz only referred to the security agreement, offer and purchase agreement, and the noncompete agreement—not the promissory note. Hakenjos Hall fails to mention that the purchase agreement itself specifically refers to the promissory note, and makes no other substantive arguments regarding the sufficiency of the pleadings.

65

doctrine of election of remedies applies only when a party seeks inconsistent remedies based on the same set of facts. (*Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1218 [" 'Where a person has two concurrent remedies to obtain relief *on the same state of facts,* and *these remedies are inconsistent,* he must choose or elect between them; and if he has clearly elected to proceed on one, he is bound by this election and cannot thereafter pursue the other.' "].) "The doctrine is based on estoppel and, when applicable, operates only if the party asserting it has been injured." (*Pac. Coast Cheese, Inc. v. Sec.-First Nat. Bank* (1955) 45 Cal.2d 75, 80.) Here, the parties discussed the order in which to proceed and the court exercised its discretion to hear the equitable issues after the jury trial. (*Darbun Enterprises, Inc. v. San Fernando Community Hospital* (2015) 239 Cal.App.4th 399, 409, fn. 4 ["it is fully within a trial court's discretion to have a jury try the legal issues first"].) Neither party was harmed by the procedure adopted by the trial court. As we next discuss, the trial court's ruling on the equitable issues was not inconsistent with the findings actually made by the jury. We therefore conclude that the election of remedies doctrine does not apply because the asserted claims were not "*necessarily repugnant* to [n]or a *repudiation of*" one another. (*Denevi*, at p. 1218.)

Hakenjos Hall's remaining contentions are that the court "failed to defer to the jury's verdict finding that Hakenjos was not liable to Schwartz under the [n]ote." According to Hakenjos Hall, because the trial court instructed the jury that there was a single unified contract under Civil Code section 1642, the jury's verdict against the Schwartz parties on their breach of contract claims also means the jury made findings in favor of Hakenjos Hall on the promissory note. Hakenjos Hall further reasons that these purported jury findings were binding on the court. We reject Hakenjos Hall's

66

claims and conclude the trial court properly construed the parties' contract and granted equitable relief regarding the promissory note.

Neither the instruction pursuant to Civil Code section 1642 nor the jury's findings establish that the trial court erred. Civil Code section 1642 provides that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." However, "[w]hile it is the rule that several contracts relating to the same matters are to be construed together (Civ. Code, [§] 1642), it does not follow that *for all purposes* they constitute one contract." (*Malmstedt v. Stillwell* (1930) 110 Cal.App. 393, 398, italics added; see *Hartford Accident & Indem. Co. v. Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285, 1300 [Civil Code section 1642 is an aid in the interpretation of contracts but "does not . . . make two contracts one for all purposes"].) Even when interpreting a single contract, it is necessary to determine whether the obligations and promises exchanged are independent covenants. " 'The law is settled that where covenants of a contract are to be performed at different times, they are independent, and the breach by one party of his covenant does not excuse the performance by the other party of his covenant or relieve him of liability for damages for a breach thereof.' " (*Colaco, supra*, 25 Cal.App.5th at p. 1183; accord, *Starr v. Davis* (1930) 105 Cal.App. 632, 635 (*Starr*); see *Verdier v. Verdier* (1955) 133 Cal.App.2d 325, 334 (*Verdier*) ["If the covenants are independent, breach of one does not excuse performance of the other."].)

Applying these principles here, we conclude the trial court did not err in ruling that Schwartz's "failure to abide by the covenant not to compete and the distance agreement do[es] not eliminate [Hakenjos Hall's] duty to pay for the building." Our conclusion is consistent with *Starr*, where the court found that one party's obligation to pay on a promissory note for the purchase of a

67

business and the other party's agreement not to compete were independent covenants because they required performance at different times. (*Starr*, *supra*, 105 Cal.App. at pp. 634-635.) The court rejected the purchaser's argument that the seller's violation of the noncompetition provision in the purchase agreement excused the purchaser's obligation on the note. (*Id*. at pp. 634-636.) It was therefore appropriate to award damages for the breach of the covenant not to compete to the purchaser, to award the amount due under the note to the seller, and to offset the damages awards against one another. (*Ibid*.) The situation here is similar. Hakenjos Hall's obligation to pay on the note was independent of Schwartz's noncompete obligations. The noncompetition restrictions began immediately and remained in effect continuously for a 10-year period, whereas the first payment under the note was not due until the third year following the closing and then payable on a monthly basis thereafter. (See *ibid*. [promises to be performed at different times—one year for the payment on the note and two years for the promise not to compete—supported finding that they were independent]; accord, *Colaco*, *supra*, 25 Cal.App.5th at pp. 1183-1184.) If the parties had intended to relieve Hakenjos Hall from the obligation to pay upon violation of the noncompetition restrictions, their agreement would have expressly so provided; the fact that it did not further supports the trial court's ruling. (See *Verdier*, *supra*, 133 Cal.App.2d at p. 334 ["To construe covenants as dependent is to work a forfeiture as to one party, and no obligation of a contract is to be regarded as a condition precedent unless made so by express terms or necessary implication."].) There was nothing in the purchase agreement indicating the parties intended that Hakenjos Hall would be entitled to stop making payments under the note if there was a breach of the noncompetition provisions. As in *Starr*, it would be inequitable to permit the

68

buyer (Hakenjos Hall) to continue operating the business and receive damages for breach of the agreement, but be excused from all obligations to pay the balance of the purchase price. (*Starr*, at pp. 634-635 [rejecting seller's argument which would effectively require "that as a penalty for [the seller's] breach, [the purchaser] might keep the business without paying therefor," stating "[s]uch is not the law"].) The trial court properly held that Schwartz's breach of the noncompetition restrictions did not excuse Hakenjos Hall's payment of the note.

We further reject Hakenjos Hall's final claim of error because, contrary to Hakenjos Hall's assertion, the jury made no specific findings regarding the promissory note. Hakenjos Hall repeatedly contends Schwartz "sued . . . with respect to the *Note* and lost," and the jury's purported determination against Schwartz "*on the Note*" was "dispositive." (Italics added.) To support this claim, Hakenjos Hall cites portions of the special verdict form where the jury purportedly was asked to make findings *on the note.* Hakenjos Hall's references to "the [n]ote" in this context are misleading and inaccurate.[51] Although the trial court noted that the parties *could* submit separate questions regarding the promissory note to the jury, they never did so on the jointly submitted special verdict form. The jury was not asked to determine any damages relating to breach of contract except those damages resulting from the "first material breach," and it expressly attributed Hakenjos Hall's damages award to "[l]oss of profits from [noncompete] and goodwill breach."

---

[51] For example, Hakenjos Hall contends that "Schwartz . . . submitted a [v]erdict [f]orm that contained a space for the jury to find a breach of contract *with respect to the Note*," and "Question 5 [on the] [v]erdict [f]orm . . . asked what Schwartz's damages were *for breach of the Note*." (Italics added.) But the cited portions of the special verdict form make no mention of the promissory note.

69

For this reason, Hakenjos Hall's reliance on *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146 is misplaced. In *Hoopes,* the court observed that, when legal issues are tried before equitable ones, "a jury's determination of legal issues may curtail or foreclose equitable issues" because "the first fact finder binds the second on common issues of fact." (*Id.* at pp. 157-158.) In that case, the trial court erred when, after trial, it "made a wholly independent evaluation of the trial evidence and rejected the jury's findings of fact." (*Id.* at p. 159.) That did not occur here, as the jury made no contrary findings—or any findings—on the promissory note.

V

*The "Jake-and-Roberta" Judgment*

As previously discussed, after judgment was entered, the Schwartz parties moved for judgment notwithstanding the verdict, arguing there was no evidence to support a judgment against Roberta or Jacob. The motion was filed on behalf of "[KSI], Martin Schwartz, Jacob Schwartz, Roberta Korte Schwartz (individually and in her capacity as trustee of the Korte Family Trust), and Schwartz and Schwartz." The Schwartz parties argued there was no evidence to support "findings of liability against Roberta Korte (a non-party to the parties' contracts)," and similarly argued there was no evidence to support a finding of liability against Jacob, who also was not a party to any contract.

When Hakenjos Hall failed to address the lack of evidence to support a verdict against Roberta and Jacob, the trial court granted the motion for judgment notwithstanding the verdict as to those individuals, stating, "The motion is granted as to Roberta Korte and Jacob Schwartz. The motion is denied in all other regards."

70

The trial court subsequently entered an order submitted by Schwartz. The order provided: "The Court hereby enters judgment in favor of Jacob Schwartz and Roberta Korte Schwartz (individually and in her capacity as trustee of the Korte Family Trust) notwithstanding the verdict delivered by the jury . . . as to all of the causes of action asserted against them . . . . Those causes of action are hereby DISMISSED on their merits and with prejudice. [¶] . . . Jacob Schwartz and Roberta Korte Schwartz (individually and in her capacity as trustee of the Korte Family Trust) are prevailing parties for purposes of entitlement to costs . . . , and shall have and recover of plaintiffs such costs as the Court shall award to them . . . ."

In response to Hakenjos Hall's section 473, subdivision (b) motion to vacate the order entered, the trial court found that the order entered did not comport with its ruling:

> "Defendants prepared a proposed order that was inconsistent with this Court's order . . . . Defendants explicitly included that the motion was granted as to Roberta Korte Schwartz 'Individually and in her capacity as trustee of the Korte Family Trust.' The Court did not explicitly find [the] same. Defendants' . . . motion did not show that there was a lack of evidence to support any cause of action against the Korte Family Trust, such that it would have been improper to have a judgment against Roberta Korte Schwartz as trustee of the Korte Family Trust. . . . Further, the Court never found Jacob Schwartz and Roberta Korte Schwartz were prevailing parties."

Rather than granting relief pursuant to section 473, the court exercised its authority under section 128, subdivision (a), to vacate the order and directed Hakenjos Hall "to prepare a proposed order consistent with the Court's ruling." Hakenjos Hall prepared, and the trial court entered, an "order on Plaintiffs' motion to vacate order," which simply stated the court

71

granted the motion and attached a copy of the court's minute order. No further order was entered.

Schwartz contends the trial court erred when it vacated the "Jake-and-Roberta" judgment. We disagree. "[E]very court has power to amend and control its orders so as to make them conformable to law and justice." (*People v. Eggers* (1947) 30 Cal.2d 676, 692; § 128, subd. (a)(8) ["Every court shall have the power to . . . [¶] . . . [¶] amend and control its process and orders so as to make them conform to law and justice."].) In exercising this power, the court may amend the record to make it " 'speak the truth and show the actual facts.' " (*Hamilton v. Laine* (1997) 57 Cal.App.4th 885, 890-891, 892-893, italics omitted.) The trial court properly exercised its discretion to do so here. When it realized that the entered order did not properly reflect the substance of the court's ruling partially granting Schwartz's motion for judgment notwithstanding the verdict—"as to Roberta Korte and Jacob Schwartz" and "denied in all other regards"—the trial court vacated the mistaken order.

Nonetheless, it is clear the trial court intended to relieve Jacob and Roberta—in her individual capacity—from liability. As it stands, the trial court's order partly granting the Schwartz parties' motion for judgment notwithstanding the verdict on this limited issue was vacated, but it was not replaced with a new order conforming to the trial court's original ruling. Thus, to ensure that the judgment comports with the trial court's ruling, we modify the judgment to provide that the Schwartz parties' motion for judgment notwithstanding the verdict is granted as to Jacob and Roberta (in her individual capacity).

The only question properly before this court is whether the trial court erred when it vacated its prior order and issued a new order reflecting its actual ruling. We already concluded there was no error. Although the

72

Schwartz parties contend they also filed the motion for judgment notwithstanding the verdict on behalf of Roberta in her capacity as trustee, they have forfeited any claim based on insufficiency of the evidence in this regard. "A trial court must render judgment notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted. (Code Civ. Proc., § 629.) A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] The moving party may appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict, or both. (Code Civ. Proc., § 904.1, subd. (a)(4) [making such an order appealable].) As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Sweatman v. Dept. of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) " 'An appellant asserting lack of substantial evidence must fairly state all the evidence, not just the evidence favorable to the appellant. [Citation.] The appellant must "marshall *all* of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding." [Citations.] A failure to state all material evidence may be deemed a waiver of the argument that the evidence was insufficient.' " (*Hartt v. County of Los Angeles* (2011) 197 Cal.App.4th 1391, 1402.) The Schwartz parties' conclusory statement that "there was no substantial evidence that would support a judgment against either Jacob or Roberta as to any cause of action" is not sufficient to meet this burden.

## VI

### *Korte Family Trust*

"A trust itself cannot sue or be sued.  [Citation.]  'As a general rule, the trustee is the real party in interest with standing to sue and defend on the trust's behalf.  [Citations.]'  [Citation.]  'A claim based on a contract entered into by a trustee in the trustee's representative capacity, . . . may be asserted against the trust *by proceeding against the trustee in the trustee's representative capacity . . . .'* "  (*Portico Management Group, LLC v. Harrison* (2011) 202 Cal.App.4th 464, 473 (*Portico*).)

As previously indicated, judgment was entered against the Korte Family Trust, among others.  We requested that the parties submit supplemental briefing addressing whether the judgment should be modified to remove references to the Korte Family Trust as a separate party.  The parties agree that, because a trust itself cannot sue or be sued, the Korte Family Trust is not an appropriate party to the action.  (*Portico*, *supra*, 202 Cal.App.4th at p. 476 ["[a] judgment against a trust, rather than against its trustees, is not enforceable"].)  We agree and therefore modify the judgment to strike references to the Korte Family Trust as a separate party. (§ 43; *Prescott v. O'Connell* (1938) 27 Cal.App.2d 220, 224 [modifying judgment to strike reference to party not involved in proceedings]; see also *Dyer v. Minturn* (1920) 47 Cal.App. 1, 7 [modifying judgment to comport with law].)

## DISPOSITION

The judgment is modified to strike reference to the "Korte Family Trust" as a separate party, to provide that the Schwartz parties' motion for judgment notwithstanding the verdict is granted as to Jacob Schwartz and Roberta Korte Schwartz (in her individual capacity), and to grant judgment in favor of Jacob Schwartz and Roberta Korte Schwartz (in her individual capacity). As modified, the judgment is affirmed. The parties shall bear their own costs on appeal.

GUERRERO, J.

WE CONCUR:

HALLER, Acting P. J.

AARON, J.